IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION


| | | |
|---|---|---|
| ROBERT LLOYD, | § | CV NO. 1:13-CV-505 |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| LISA BIRKMAN, CYNTHIA LONG, | § | |
| VALERIE COVEY, and RON | § | |
| MORRISON, individually and in their | § | |
| official capacities as County | § | |
| Commissioners of Williamson County, | § | |
| Texas, and DAN A. GATTIS, | § | |
| individually and in his official capacity | § | |
| as County Judge of Williamson County, | § | |
| Texas, and WILLIAMSON COUNTY, | § | |
| TEXAS, | § | |
| | § | |
| Defendants. | § | |
| _____ | § | |
| | § | |


ORDER ADOPTING IN PART AND VACATING IN PART
REPORT AND RECOMMENDATION

Before the Court are three sets of Objections to the Magistrate Judge's

Report and Recommendation (Dkt. # 58), filed by Defendant Dan A. Gattis

("Gattis") (Dkt. # 60); Defendants Williamson County, Lisa Birkman ("Birkman"),

Valerie Covey ("Covey"), Cynthia Long ("Long"), and Ron Morrison

("Morrison") (Dkt. # 61) (collectively, "Defendants"); and Plaintiff Robert Lloyd

("Lloyd") (Dkt. # 62).[1]  After reviewing the Objections and the supporting and

opposing memoranda, the Court **ADOPTS IN PART AND VACATES IN PART**

the Memorandum and Recommendation (Dkt. # 66).

BACKGROUND

I.    Factual Background

        On February 14, 2013, the sitting Constable for Williamson County's

Precinct 3, Bobby Gutierrez, submitted his resignation to the Williamson County

Commissioners' Court.  ("Defs. MSJ," Dkt. # 40, Ex. A at 3.)  Faced with an

opening and an election over a year away, the Commissioners invoked their power

under Texas Local Government Code § 87.041 to appoint a new constable to serve

until the next general election.  ("Pl. MSJ," Dkt. # 41, Ex. 1.)

        On March 6, 2013, the Court, whose five members were County

Judge Gattis, Precinct One Commissioner Birkman, Precinct Two Commissioner

Long, Precinct Three Commissioner Covey, and Precinct Four Commissioner

Morrison, issued a call for applications to fill the vacancy.  (Id.)  The Court

approved Gattis and Covey to review the resumes and select five final candidates

for interviews.  (Id.)

---

[1] The Objections were originally filed by Lloyd, Fred Churchill ("Churchill"), and Robert Goodrich ("Goodrich").  Churchill and Goodrich have since settled their claims and are no longer party to the suit.  (Dkts. ## 72, 73.)  Accordingly, the Court addresses all pending motions only with respect to Lloyd.

On March 18, 2013, the Court conducted an executive session to privately interview candidates Churchill, Goodrich, Lloyd, Kevin Stofle ("Stofle"), and Wade Fowler ("Fowler").  (Pl. MSJ, Ex. 16; Defs. MSJ, Ex. A at 40.)  During the interviews, the candidates received questions on their positions on abortion and same-sex marriage, their political affiliations, the churches that they attended, and their political ideology.[2]  ("Lloyd Dep.," Pl. MSJ, Ex. 2, Ex. B at 164:15–167:5, 170:6–17; "Churchill Dep.," Pl. MSJ, Ex. 3, Ex. B at 106:19–107:20, 112:2–113:18; "Goodrich Dep.," Pl. MSJ, Ex. 4, Ex. B at 91:18–92:22, 117:1–118:13, 120:22–121:5.)

Specifically, Lloyd attests that Birkman's first question to him was about his views on abortion, and Lloyd replied that, based on his Catholic faith, he was pro-life.  (Lloyd Dep. 164:11–165:15.)  He then clarified that that view was somewhat qualified in circumstances of rape, incest, or health of the mother.  (Id. at 205:1–206:20.)  Lloyd states that Long and Covey frowned and exchanged disapproving glances upon hearing Lloyd's answer.  (Id.)

Birkman next asked about his views on same-sex marriage; Lloyd responded that he was heterosexual man who had been married to his wife for over nineteen years; based on his faith, he believed that marriage was between a man

_____

[2] Stofle was not separately interviewed for the interim constable position.  Instead, the Commissioners relied on his interview for the Justice of the Peace position, which had occurred a month before, in making the hiring decision.  (See Dkt. # 49, Ex. 30 at 28:14–17.)

and a woman; but, nonetheless, the laws were shifting and the Supreme Court could change at any time.  (Id. at 165:20–167:20.)  Birkman responded that if he was appointed to the position, he would need to come up with a better answer.  (Id.)

Lloyd attests that Covey then took over questioning and asked him which church he attended.  (Id. at 170:1–173:5.)  Lloyd responded that he attended St. Helen's Catholic.  (Id.)  Covey asked Lloyd some additional questions, and then Long began to question him.  (Id.)  Lloyd attests that Long asked him if he was a Republican or a Democrat; Lloyd responded that although he didn't understand why he was asked the question, he was a Republican.  (Id. 174:8–177:17, 185:7–19.)  Long then asked him if he was a liberal or conservative, to which he responded that if Republicans are conservative and Democrats are liberal, he answered the question when he stated that he was a Republican.  (Id. at 181:1–25, 185:7–19.)  Before Lloyd could respond, Birkman pulled up his voting record on her phone and announced that he had voted Republican.  (Id. at 189:13–24.)

During the interviews, Covey noted with regard to Lloyd, "R – vote," "prolife – + ≈ gay rights – not definitive."  (Pl. MSJ, Ex. 11, Ex. A.)  Following their interviews of the candidates, the Commissioners opened their session to the public and formally voted in Stofle as the interim county constable.  (Defs. MSJ, Ex. A at 491; Gattis Dep. 209:3–7; Morrison Dep. 66:9–22.)

II.     Procedural Background

On June 17, 2013, Lloyd filed a Complaint in this Court against

Birkman, Long, Covey, Morrison, and Gattis, alleging violations of the First and

Fourteenth Amendments of the U.S. Constitution and the provisions of the Texas

Constitution protecting Equality Rights and Privacy and prohibiting Religious

Tests.  (Dkt. # 1.)   On March 18, 2013, Lloyd amended his Complaint to include

Goodrich and Churchill as plaintiffs, Williamson County as a defendant, and

claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Texas

Commission on Human Rights Act ("TCHRA"), Tex. Labor Code § 21.051.  (Dkt.

# 11.)

On September 22, 2014, Gattis filed his Motion for Summary

Judgment (Dkt. # 33); on the same day, the remaining defendants filed their

Motion for Summary Judgment (Dkt. # 40).  The Motions sought summary

judgment on all of Lloyd's claims.  Lloyd filed a Response to both Motions on

October 27, 2014 (Dkt. # 48), and Defendants filed Replies on November 14, 2014

(Dkts. ## 51, 54, 55).  Meanwhile, on September 22, 2014, Lloyd filed a Motion

for Partial Summary Judgment, which sought summary judgment on his invasion

of privacy claim under the Texas Constitution.  (Dkt. # 41.)  Defendants filed their

Response on October 27, 2014 (Dkt. # 47),[3] and Lloyd filed his Reply on November 14, 2014 (Dkt. # 56).

On September 22, 2014, U.S. District Judge Yeakel referred the case to Magistrate Judge Lane (Dkt. # 37). On November 20, 2014, the Magistrate Judge issued a Report and Recommendation (Dkt. # 58). On December 4, 2014, all parties submitted Objections to the Report and Recommendation. (Dkts. ## 60, 61, 62.)

On December 8, 2014, Judge Yeakel transferred the case to this Court. (Dkt. # 66.) The Court scheduled oral argument on the matter for January 22, 2015. (Dkt. # 69.) On January 16, 2015, the parties informed the Court that they had gone into mediation and were pursuing settlement. At the hearing, the parties informed the Court that only two of the three plaintiffs were able to reach settlement, and oral argument went forward on the Motions.

On February 17, 2015, the Court received and granted a Motion to Dismiss all claims brought by Churchill and Goodrich, thereby terminating Churchill and Goodrich from the suit and leaving Lloyd the only remaining plaintiff. (Dkts. ## 72, 73.)

---

[3] In his Reply, Lloyd argued that Defendants' Response should be stricken from the record because it was filed three weeks after the Response deadline. (Dkt. # 56 at 6 n.11.) Lloyd also objects to the Magistrate Judge's Report and Recommendation for not addressing the argument to strike. (Dkt. # 62 at 2.) However, the Magistrate Judge could and the Court will, in its discretion, consider the merits of the Response. See Frick v. Quinlin, 631 F.2d 37, 40 (5th Cir. 1980).

On February 20, 2015, Birkman, Covey, Long, Morrison, and Williamson County filed a supplement to their Objections to the Report and Recommendation in light of the claims dismissed by Churchill and Goodrich. (Dkt. # 74.)  On March 2, 2015, Lloyd filed a supplement to his Objections.  (Dkt. # 75.)

## LEGAL STANDARD

I.      Review of a Magistrate Judge's Memorandum and Recommendation

Any party may contest the Magistrate Judge's findings by filing written objections within fourteen days of being served with a copy of the Memorandum and Recommendation.  28 U.S.C. § 636(b)(1)(C).  The objections must specifically identify those findings or recommendations that the party wishes to have the district court consider.  Thomas v. Arn, 474 U.S. 140, 151 (1985).  A district court need not consider "[f]rivolous, conclusive, or general objections."  Battle v. U.S. Parole Comm'n, 834 F.2d 419, 421 (5th Cir. 1987) (quoting Nettles v. Wainwright, 677 F.2d 404, 410 n.8 (5th Cir. 1982), overruled on other grounds by Douglass v. United States Auto. Ass'n, 79 F.3d 1415 (5th Cir. 1996)).

The Court must conduct a de novo review of any of the Magistrate Judge's conclusions to which a party has specifically objected.  See 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which

objection is made."). On the other hand, findings to which no specific objections are made do not require de novo review; the Court need only determine whether the Memorandum and Recommendation is clearly erroneous or contrary to law. United States v. Wilson, 864 F.2d 1219, 1221 (5th Cir. 1989).

II.   Motion for Summary Judgment

A movant is entitled to summary judgment upon showing that "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); see also Meadaa v. K.A.P. Enters., L.L.C., 756 F.3d 875, 880 (5th Cir. 2014). A dispute is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the nonmoving party must come forward with specific facts that establish the existence of a genuine issue for trial. Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703, 706 (5th Cir. 2013) (quoting Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 621 (5th Cir. 2000)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"

8

Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

In deciding whether a fact issue has been created, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Kevin M. Ehringer Enters. v. McData Servs. Corp., 646 F.3d 321, 326 (5th Cir. 2011) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012) (quoting Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003)).

DISCUSSION

In his Motion for Summary Judgment, Gattis argues for dismissal of the claims against him in his individual capacity, both because the evidence is insufficient to establish claims against him and because, regardless, he is entitled to a qualified immunity defense. ("Gattis MSJ," Dkt. # 33 at 6–13.) In their Motion for Summary Judgment, the remaining defendants argue for dismissal of the claims against them in their individual capacities, official capacities, and municipal capacities on various grounds. (Defs. MSJ at 15–39.) In his Motion for Partial Summary Judgment, Lloyd argues for an award of declaratory and injunctive relief

9

against Williamson County on his right to privacy claim under the Texas Constitution.  (Pl. MSJ at 8–11.)

In his Report and Recommendation, the Magistrate Judge recommended that the Court grant Defendants' Motions to the extent that the claims against the individual defendants in their official capacities should be dismissed as duplicative and the Title VII and TCHRA claims against the individual defendants should be dismissed because there is no individual liability under those statutes.   ("R&R," Dkt. # 58 at 9.)  However, the Magistrate Judge recommended that Defendants' Motions be denied in all other respects.  (See generally R&R.)  Separately, the Magistrate Judge recommended that the Court grant Lloyd's Motion for Summary Judgment.  (Id. at 22–31.)

Defendants object to the second and third recommendations on various bases, which the Court will address in turn.  (Dkt. # 60 at 1–11; Dkt. # 61 at 1–19.)  Additionally, Defendants object to the Magistrate Judge's decision not to rule on their evidentiary objections.  (Dkt. # 60 at 12; Dkt. # 61 at 20 n.14.)

Although Lloyd agrees with the Magistrate Judge's ultimate recommendations, he objects to the Magistrate Judge's decision not to rule on his evidentiary objections.  (Dkt. # 62 at 1–3.)  Additionally, he makes several objections to preserve issues for appeal, namely that (1) he never pleaded a "duty to intervene" theory, so that claim could not have been dismissed; (2) Defendants

should not be permitted to raise arguments regarding issues on which they were compelled to produce discovery and refused to do so; (3) Defendants made no argument regarding Lloyd's due process rights; and (4) Defendants would not have reached the same decision absent the illegal questions that they used to elicit answers from Lloyd.  (Id.)

The Court first addresses the evidentiary objections raised by Lloyd and Defendants, and then addresses the Defendants' Motions and Lloyd's Motion in turn.

## I.    Evidentiary Rulings

Because all parties object to the Magistrate Judge's lack of findings on the evidentiary objections, the Court reviews the evidentiary objections de novo.

### A.    Lloyd's Evidentiary Objections

In his Objections, Lloyd objects to the Magistrate Judge's failure to rule on the evidentiary objections set forth in his Response to Defendants' Motion for Summary Judgment and Reply to Defendants' Response to his Motion for Summary Judgment.  (Dkt. # 62 at 2.)  Specifically, Lloyd raises objections to evidence on the basis of hearsay, undue speculation, and irrelevance.

Hearsay is "a statement that[] . . . the declarant does not make while testifying at the current trial or hearing; and . . . a party offers in evidence to prove

the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  The Court is "not required to accept the nonmovant's conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence."  Chaney v. Dreyfus Serv. Corp., 595 F.3d 219, 229 (5th Cir. 2010).

First, in his Response to Defendants' Motions for Summary Judgment, Lloyd objects to Covey's statements that the Police Chief told her that he felt good about Stofle's work as inadmissible hearsay.  The Court overrules Lloyd's objection.  The statement is not offered to show that Stofle had good work, but rather is offered to show that Covey preferred Stofle because of the recommendation that she received from the Police Chief.  Because she was party to the conversation and the statement is not offered to prove the truth of the matters discussed, and instead offered to prove Covey's personal knowledge about the candidates, the statement is not barred as hearsay.

Second, Lloyd objects that Defendants' deposition testimony about "the way the electorate could vote if someone in a crowd during a campaign asked similar questions to the question at issue and whether voters knew or cared deeply about the answers from a constable" is unduly speculative.  (Dkt. # 48 at 30–31; Dkt. # 56 at 10 n.38.)  Apart from this description, Lloyd does not specifically identify the testimony to which he objects.

The Court has reviewed Defendants' factual recitation, which contains the statement, "[i]t is very unlikely that a candidate whose answers are not consistent with the Republican platform could be elected in Williamson County, Precinct Three."  (Defs. MSJ at 8.)  In support, Defendants cite to deposition testimony from Commissioner Long and Commissioner Morrison.  (<u>Id.</u>)  Additionally, the Court notes Defendants' statement that "[o]n the campaign trial in Williamson County, and in particular in Precinct Three, candidates are consistently asked their views on abortion and gay marriage, their voting record, and/or where they attend church," which is suppored by deposition testimony from each of the County Commissioners.  (<u>Id.</u> at 8.)

In her deposition, Long testified that the reason she asked the questions at issue in this case was as follows:

> [I]n regard to the other question of why I asked them if they were going to run as Republican or Democrat, it is – Precinct 3 of Williamson County is a very Republican precinct and the likelihood of somebody running as a Democrat in March of 2014 and winning was very slim.  And, as I said earlier, who we appoint, to some extent, is a reflection of who I – you know, of myself and so I want to make sure that somebody is electable.

(Long Dep. at 54.)

In response to why he thought the questions were reasonable in this context, Morrison testified, "[T]hese questions were asked because they were the

questions that [the appointee] would see when [he] run[s] for reelection in that particular precinct."  (Morrison Dep. at 61.)

To the extent that the testimony is proffered to demonstrate that the Commissioners <u>believed</u> that the candidates' positions on abortion and gay marriage, their political affiliation, and their church membership would affect their electability, the evidence is not unduly speculative, and the Court overrules Lloyd's objection.  However, the Court finds that the evidence, standing alone, is insufficient to demonstrate that, as a fact, a candidate's position on the question at issue would affect their electability.

Nonetheless, the Court notes that Defendants have proffered other evidence that could support the fact that the positions on the issues would affect electability, including testimony from the Commissioners regarding their observations of similar questions asked in past elections (Birkman Dep. 77:3–82:25; Gattis Dep. 30:3–25; Long Dep. 17:20–18:11); 2010 primary election statistics showing 82.58% of ballots cast as Republican and 17.42% cast as Democratic (Def. MSJ, Ex. A at 700); and testimony from Commissioner Gattis that the Commissioners, as members of the Republican party, have taken a "firm stance" on abortion and gay marriage (Gattis Dep. 30:10–13).

Third, Lloyd objects to the introduction of evidence that Defendants' lawyer discovered about him during discovery that was not available to Defendants

at the time of the interview.  (Dkt. # 48 at 44.)  Lloyd does not identify or provide

citation for this objection.  Although the Court agrees that such evidence would

likely be irrelevant to the instant case, the Court cannot rule on the objection

without knowing the specific evidence to which Lloyd refers.

> B.   Defendants' Evidentiary Objections

In their Reply to Lloyd's Response to their Motion for Summary

Judgment, Defendants make various evidentiary objections, which they re-urge

before this Court.  (Dkt. # 51 at 10 n.5;[4] Dkt. # 55, Ex. A; Dkt. # 60 at 12; Dkt.

# 61 at 20 n.14.)  The Court addresses each objection in turn.

> 1.   Request to Strike Lloyd's Factual Appendix

Defendants first request that the Court strike Lloyd's factual appendix

to his Motion for Summary Judgment on the basis that it was untimely filed.  (Dkt.

# 55, Ex. A at 2.)  The Court overrules the objection and will, in its discretion,

consider the filing.  See Frick, 631 F.2d at 40.

> 2.   Texas Municipal Police Association Survey of Stofle

Defendants next object to the Texas Municipal Police Association

Survey (the "TMPA Survey") of Kevin Stofle, which is attached as Exhibit 13,

Attachment A to Lloyd's Response, as inadmissible hearsay.  (Dkt. # 55, Ex. A at

---

[4] Gattis objects to the Texas Municipal Police Association Survey and the Public
Safety Report on the same bases as the Remaining Defendants.  Accordingly, the
Court addresses the objections collectively.

2.) The TMPA Survey was prepared by the Texas Municipal Police Association for the Georgetown Police Officers Association to determine job satisfaction levels in the Georgetown Police Department and to identify problems within the department. (Dkt. # 48, Ex. 13, Att. A.) Among other things, the TMPA Survey shows high levels of dissatisfaction regarding Stofle's leadership of the Department. (Id.)

   If the Survey were offered to prove the truth of the matters asserted therein or, in other words, that the negative reviews of Stofle contained in the report were true, the Survey would constitute hearsay. However, Lloyd proffers the report as evidence of information that certain Commissioners had available at the time they made their appointment decision, not as proof of the matters asserted therein. Testimony from Birkman and Covey corroborates that some of the Commissioners were aware of the TMPA Survey during the appointment process. (Birkman Dep. 122:2–25; Covey Dep. 74:12–22.) Accordingly, for the purposes for which the Survey was proffered, it does not constitute inadmissible hearsay.

    3. <u>Public Safety Report</u>

   Defendants next object to the Public Safety Report, which Lloyd attaches to his Response to the Motions for Summary Judgment has Exhibit 13, Attachment B. (Dkt. # 55, Ex. A. at 2.) The Public Safety Report recounts an investigation into a 2006 vehicle crash and includes statements from the

investigating officer that he believed that Stofle took the intoxicated driver, who was Stofle's friend, home after she crashed her vehicle in 2006.  (Dkt. # 48, Ex. 13, Att. B.)  Stofle was never charged for that conduct or disciplined.  (Id.)  Like the TMPA Survey, the Public Safety Report was not offered to prove the matters asserted therein, but to demonstrate information that the Commissioners had available at the time of the appointment decision.  Again, testimony from some of the Commissioners corroborates the fact that the Public Safety Report was available during the appointment process.  (Covey Dep. 133:9–13, 135:15–21; Gattis Dep. 84:1–4, 85:21–24, 86:21–87:8.)  Accordingly, for the same reasons discussed above, the Court overrules the objection.

    4. <u>Conclusions About Religion</u>

    Defendants next object to statements in page 23 of Lloyd's Response that refer to "wide variations among different denominations of Christians," "wide variations within other religions," what Christians "might find repugnant," and the "uneasy coexistence for nearly 2,000 years" amongst Sunnis and Shias.  (Dkt. # 55, Ex. A at 2.)  Defendants argue that the references are not supported by any record citation, are irrelevant, assume facts not in evidence, and are conclusory.  (Id.)  The Court agrees, and strikes the factual statements from the Response.

### 5.   Comparisons of Religious Services

Defendants next object to a statement in Lloyd's Response that Commissioners Court members attended "more religiously conservative Protestant services" than Lloyd.  (Id.)  Defendants argue that there is no showing that Catholic and Episcopalian services are "less religiously conservative" than Birkman's Methodist Services and object to the statement as vague and ambiguous, assuming facts not in evidence, unsupported by the record, conclusory, vague and ambiguous, and opinion evidence.  (Id.)  The Court agrees.  The record citations supporting the statement establish the particular churches and church denominations of each of the County Commissioners and of Lloyd, but establish nothing as to how conservative each church is.  Accordingly, the Court strikes the statement from the Response.

### 6.   "Fervor in Opposing Gay Marriage"

Defendants next object to Lloyd's statement in his Response that "Defendants did not believe Plaintiffs were able to equal Defendants' definitive fervor in opposing gay marriage with their answers."  (Id.)  Defendants argue that the statement is unsupported with record citation, is conclusory, and consists of opinion.  The statement is an opinion characterizing the factual record without citation, and the Court strikes the statement from the Response.

7.   <u>Birkman's Statement</u>

Defendants next object to Lloyd's statement in his Response that "Defendant Birkman actually announced on behalf of the rest of the commissioners that Mr. Lloyd would need to have a better answer about gay marriage to get the appointment for constable." (<u>Id.</u>)  Defendants argue that the reference assumes facts not in evidence and is contrary to the record.  In support of the statement, Lloyd cites to his own affidavit, which uses nearly identical language, and interrogatory responses from each of the County Commissioners admitting that at least one Defendant communicated to at least one Plaintiff that he would need a better answer to a question about gay marriage or abortion if he wanted to be county constable.  (Morrison Dep. at 53; Long Dep. at 40; Birkman Dep. at 15; Covey Dep. at 35; Gattis Dep. at 9.)  Accordingly, the Court finds that the statement is supported by the record and overrules Defendants' objection.

8.   <u>Stofle's Religion</u>

Defendants next object to Lloyd's statement in his Response that "the three Plaintiffs had different religious views than . . . Kevin Stofle," arguing that there is no admissible evidence on Stofle's religious beliefs.  (Dkt. # 55, Ex. A at 3.)  In support, Lloyd cites to deposition testimony from various commissioners, the most relevant of which states that Stofle attended the Celebration Church, which was a Christian Church.  (Gattis Dep. 64:15–18.)

The Williamson County website corroborates Gattis's testimony that Stofle is a member of the Celebration Church.  Kevin Stofle, Constable Precinct 3, Williamson County, http://www.wilco.org/CountyDepartments/Constables/Precinct3/tabid/220/language/en-US/Default.aspx; see also In re Katrina Canal Breaches Consol. Lit., 553 F. Supp. 2d 615, 632 (E.D. La. 2008) ("The Fifth Circuit has determined that courts may take judicial notice of governmental websites") (collecting cases).  Taken together, this evidence is sufficient to prove Stofle's church membership, but does not prove anything with regard to Stofle's religious beliefs.  Accordingly, the Court strikes "Stofle" from the statement to which Defendants object.

        9.    <u>Declaration of Eddie Hurst</u>

Defendants next object to Hurst's affidavit as inadmissible on the basis that comments are inadmissible stray remarks when they were made two or more years after the incident at issue.  (Dkt. # 54 at 7; Dkt. # 55, Ex. A at 3.)  In support, they cite to the Fifth Circuit's direct evidence stray remark test, which requires that comments meet the following factors to constitute direct evidence of discrimination the comments must be: "1) related to the protected class of persons of which the plaintiff is a member; 2) proximate in time to the complained-of adverse employment decision; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue."

Jackson v. Cal-W. Packaging Corp., 602 F.3d 374, 380 (5th Cir. 2010).  While

Defendants are correct that "standing alone," [the comment would be] insufficient

to defeat summary judgment," id., the evidence here does not stand alone.  It is

offered as circumstantial evidence to support Lloyd's pretext showing.

Accordingly, to the extent that the stray remarks test is applicable at all, the

two-part stray remarks test for circumstantial evidence is applicable, which only

requires that the remarks (1) "demonstrate discriminatory animus" and (2) be made

by a person primarily responsible for the challenged employment action[.]"

Laxton v. Gap Inc., 333 F.3d 572, 583 (5th Cir. 2003).  Because proximity in time

is not part of the inquiry for remarks offered as circumstantial evidence of pretext,

Defendants' argument that the evidence is inadmissible fails.

      Defendants also raise various points challenging the credibility of the

testimony.  (Dkt. # 54 at 6.)  However, such arguments are for the factfinder.

Accordingly, the Court overrules Defendants' objections to Hurst's affidavit.

      10.   Expert Witness Report

      Defendants next object to Lloyd's Expert Witness Report, attached as

Exhibit 17 to his Response, as (1) irrelevant and unreliable; (2) an impermissible

legal opinion; (3) unhelpful to the trier of fact; (4) not based on facts and data

reasonably relied on by experts in the field; (5) containing reasoning and

methodology that cannot be properly applied to the facts at issue; (6) not based on

sufficient facts or data; (7) not the product of reliable principles and methods; and (8) not based on a showing that the witness applied the principles and methods reliably to the facts of the case.  (Dkt. # 55, Ex. A at 3.)  Additionally, Defendants argue that the witness's conclusion that abortion and gay marriage have "nothing to do with the job or duties of constable" is inadmissible because it is contradicted by Lloyd's testimony.  (Id.)

The report at issue is an expert report made by Bill Aleshire regarding hiring practices when filling vacancies in county elected positions.  The proper vehicle for challenging expert testimony on the bases that Defendants raise is a Daubert motion.  The Court will not entertain a conclusory challenge to expert testimony buried within an exhibit to a Reply to a Motion for Summary Judgment as a Daubert challenge.  Accordingly, the Court overrules the objection. Nonetheless, the Court notes that it need not rely on the expert testimony in deciding the Motions for Summary Judgment.

11.    General References to Defendants and Questions

Defendants next object to statements in pages 34 and 39 of Lloyd's Response stating that Defendants asked Lloyd the questions at issue, arguing that there is no evidence that all of the Defendants asked the questions.  (Dkt. # 55, Ex. A at 3.)  Given that the evidence is undisputed that Gattis and Morrison did not ask

any of the questions at issue, the Court agrees with Defendants and strikes the statements from the Response.

           12.    Unreasonable Conduct

        Finally, Defendants object to a statement on page 58 of Lloyd's Response that "all of Defendants' conduct at issue was unreasonable" on the basis that the reference is irrelevant, conclusory, and a legal opinion.  (Id.)  The full sentence from the Response reads: "All of the Plaintiffs have stated that all of Defendants' conduct at issue was unreasonable."  (Dkt. # 48 at 58.)  In support, Lloyd cites to declarations form Lloyd, Churchill, and Goodrich stating that it was not a reasonable practice to ask the questions at issue.  (Id. at n.132.)  Because the statement in the Response is broader than the underlying evidence, the Court agrees with Defendants and strikes the statement.

I.      Defendants' Motions for Summary Judgment

      A.    Claims Against Individual Defendants in Official Capacities and Title VII Claims Against Individual Defendants

        Because no party objects to the Magistrate Judge's findings regarding the claims against the individual defendants in their official capacities and the Title VII claims against the individual defendants, the Court reviews the findings only to determine if they are clearly erroneous or contrary to law.

        The Court agrees with the Magistrate Judge that Lloyd cannot sustain claims against the individual defendants in their official capacities when

Williamson County has already been named as a party to the suit, as such claims would be duplicative.  See Castro Romero v. Becken, 256 F.3d 349, 355 (5th Cir. 2001).

       The Court also agrees with the Magistrate Judge that the claims against the individual defendants under Title VII and TCHRA must be dismissed. It is well established that Title VII[5] does not permit plaintiffs to recover against individual employees.  42 U.S.C. § 2000e–2(a)(1) ("It shall be an unlawful employment practice for an employer . . . ."); Indest v. Freeman Decorating, Inc., 164 F.3d 258, 262 (5th Cir. 1999) (citations omitted) (noting that the purpose of this language is to incorporate respondeat superior liability into Title VII).  Rather, Title VII liability is only available against employers and employees in their official capacities, as a suit against an employee in his official capacity is effectively a suit against the employer.  Harvey v. Blake, 913 F.2d 226, 227–28 (5th Cir. 1990) ("Because [defendant's] liability under Title VII is premised upon her role as agent of the city, any recovery to be had must be against her in her official, not her individual capacity"); see also Indest, 164 F.3d at 262 ("[A] Title VII suit against an employee is actually a suit against the corporation.").

---

[5] Because TCHRA was modeled after federal civil rights law and is intended to coordinate state law with federal law in employment discrimination cases, the Texas Supreme Court interprets TCHRA in light of federal law and the cases interpreting that law.  In re United Servs. Auto. Ass'n, 307 S.W.3d 299, 308 (Tex. 2010).

However, a plaintiff cannot sue both an employer and an employee in his official

capacity, since such a posture would subject the company to double liability.

Indest, 164 F.3d at 262.  Since Williamson County is already named as a

defendant, any claims against Defendants in their official capacities would be

duplicative.  Accordingly, the Title VII and TCHRA claims against the individual

defendants must be dismissed.

      B.     Title VII and TCHRA Claims

          Lloyd alleges that Williamson County committed an unlawful

employment practice under Title VII and TCHRA by refusing to hire him because

of his religious association, moral views, and ethical beliefs.  ("Am. Compl.," Dkt.

# 11 ¶¶ 34–38.)  Williamson County contends that dismissal of the claims is proper

because (1) Lloyd was not discriminated against based on religion; (2) Williamson

County is not an "employer" under Title VII in its relationship with county

constables; and (3) a Texas county constable is an employee exempt from Title

VII.  (Defs. MSJ at 17–20.)

          In his Report and Recommendation, the Magistrate Judge rejected

each of Defendants' arguments, concluding that Williamson County was an

employer, that the interim constable position was not exempt from liability by

nature of his position, and that there was a question of fact as to whether Lloyd was

discriminated on based on religion.  (R&R at 10–21.)  Accordingly, the Magistrate

Judge recommended that the Court deny summary judgment on the Title VII and TCHRA claims.  (Id. at 21.)

Defendants object that the Magistrate Judge incorrectly ruled that Lloyd's Title VII and TCHRA[6] claims survive.  (Dkt. # 61 at 1–7.)  Specifically, Defendants object that (1) the county constable position is exempt from Title VII because there was no employment relationship, Williamson County was not an employer, and the constable position was exempt under the elected official and policymaking exceptions; (2) the questions asked were not religion-related; and (3) there was no evidence that the questions asked caused the ultimate hiring decision.  (Id.)  Because Defendants object to the Magistrate Judge's findings regarding the Title VII and TCHRA claims, the Court reviews the findings de novo.

As noted in footnote 5, because TCHRA was modeled after federal civil rights law and is intended to coordinate state law with federal law in employment discrimination cases, the Texas Supreme Court interprets TCHRA in light of federal law and the cases interpreting that law.  In re United Servs. Auto. Ass'n, 307 S.W.3d 299, 308 (Tex. 2010).  Accordingly, unless the Texas Supreme

---

[6] Although Defendants only address Title VII in their Motion, the heading is styled "Title VII/Texas Labor Code § 21.051 claims."  (Defs. MSJ at 23).  In light of the coordinated standard, as described above, the Court assumes that Defendants sought summary judgment on both the Title VII and TCHRA claims.

Court has held otherwise, courts look equally to federal and state law in evaluating claims under TCHRA.

        1.     <u>Coverage Under Title VII and TCHRA</u>

            a.     <u>Employer</u>

Williamson County first argues that, in its employment relationship with county constables, it is not an "employer" as defined within Title VII or TCHRA because it cannot fire constables: constables must be removed from office by a state district judge following trial by a jury.  (Defs. MSJ at 18–19.)  Lloyd counters that because Williamson County is a county under the Texas Government Code, which qualifies it for personhood under Title VII and TCHRA, and because it employs over 15 employees, it meets Title VII and TCHRA's definition of employer.  (Dkt. # 48 at 5.)

Title VII and TCHRA prohibit "an employer . . . [from] fail[ing] or refus[ing] to hire . . . any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1); Tex. Labor Code § 21.051.  Under Title VII and TCHRA, the definition of employer covers county governments.  42 U.S.C. §2000e(a) (covering governments); Tex. Labor Code § 21.002(8)(D) (covering counties).  It is without question that Williamson County, as a government that

employs 15 or more employees,[7] could qualify as an employer for a hypothetical

party under Title VII or TCHRA.  Whether Williamson County can qualify as

Lloyd's employer, however, is the dispositive issue here.  See, e.g., Muhammad v.

Dall. Cnty. Comty. Supervision & Corr. Dep't, 479 F.3d 377, 381 (5th Cir. 2007)

(noting that the proper inquiry is first whether the defendant meets the statutory

definition of an employer and second whether the defendant would be the

plaintiff's employer under the hybrid economic realities/common law control test);

Oden v. Oktibbeha Cnty., 246 F.3d 458, 465 (5th Cir. 2001) (finding that the

sheriff, not the county, was the deputy sheriff's employer because the sheriff made

all appointment, removal, and compensation decisions regarding deputies, subject

to the county's budget approval).

       "Federal law controls whether a person is an employer under Title

VII, but courts can look to state law to understand the nature of the employment

relationship."  Id. at 465.  In so doing, courts implement the "hybrid economic

realities/common law control test," which examines the extent of the employer's

control over the plaintiff.  Muhammad, 479 F.3d at 380 (quoting Deal v. State

Farm Cnty. Mut. Ins. Co. of Tex., 5 F.3d 117, 119 (5th Cir. 1993)); Guerrero v.

Refugio County, 946 S.W.2d 558, 566–69 (Tex. App. 1997) (applying the

---

[7] Although TCHRA requires no minimum amount of employees, Tex. Labor Code
§ 21.002(8)(D), Title VII requires that the employer employ at least fifteen
employees.  42 U.S.C. § 2000e(b).

economic realities/common law control test to evaluate employment relationship

under the TCHRA).  The control part of the test, which is most important, analyzes

"whether the alleged employer has the right to hire and fire the employee, the right

to supervise the employee, and the right to set the employee's work schedule."

Deal, 5 F.3d at 119.  The economic realities part of the test analyzes "whether the

alleged employer paid the employee's salary, withheld taxes, provided benefits,

and set the terms and conditions of employment."  Id.

Two cases on the employment relationship of county and municipal

employees are instructive to the instant case.  In Moore v. Harris, the court

examined whether the County was an employer of a deputy/licensed peace officer,

ultimately concluding that there was an employment relationship between the

County and the officer.  Memorandum and Order, No. Civ. A. H-98-1776, at *4

(S.D. Tex. May 31, 2001).  With regard to control, the court found that the County

exercised some control over the officer's employment because the constable was

required to obtain authority from the County Commissioners to appoint her and the

County's power to set her salary controlled the financial aspect of her promotions.

Id. at *7–8.  With regard to economic realities, the court found that the County was

responsible for setting deputies' salaries, paying those salaries, and withholding

taxes.  Id. at 6.  Ultimately, the court concluded that the County was her employer,

"given the significant economic realities" of their relationship, and the control that

the county could exercise over her employment.  Id. at 8; see also Memorandum and Order, Frank v. Harris County, No. Civ.A. H-99-2383, at *6–7 (S.D. Tex. Dec. 19, 2002) (citing Moore and finding that Harris County was the employer of deputy constables).

   In contrast, in Guerrero v. Refugio County,[8] the court examined whether the County or the state district judges were employers of the county auditor, and ultimately concluded that no employment relationship existed with either.  946 S.W.2d 558, 566–69 (Tex. App. 1997).  With regard to control, the court found that statutory authority to appoint or remove the county auditor and approve assistant auditors was vested in the district judges, and that consequently the County did not have control over the county auditor.  Id. at 567.  Nonetheless, the court concluded that the district judges also lacked control over the county auditor because they had no authority to "determine who or what is audited, how the auditing functions are to be handled, or when the audits are to be conducted." Id. at 568–69.  The court concluded that the economic realities were also indeterminate, since the County was responsible for paying the county auditor's

---

[8] The Texas Supreme Court overturned Guerrero, to the extent that it held that a direct employment relationship was required under TCHRA and that indirect employment relationships were not covered.  NME Hosps., Inc. v. Rennels, 994 S.W.2d 142, 146–47 (Tex. 1999).  Because this is a direct employment relationship, and because the Texas Supreme Court's comment on Guerrero was limited to its ruling on indirect employment relationships, the Court finds that Guerrero remains valid law on the applicability of the economic realities/common law control test to assess direct employment relationships.

salary and social security taxes, but the district judges set the salary.  Id. at 567,

569.  Ultimately, the court concluded that neither the County nor the district judges

had an employment relationship with the county auditor.  Id.; see also Thompson

v. City of Austin, 979 S.W.2d 676, 678–79 (Tex. App. 1998) (citing Guerrero and

finding that the City Council of Austin was not the employer of municipal judges

because the Council's power to appoint and remove judges was limited by statute,

municipal judges had independent authority to create procedural rules, and the City

had no authority to alter the salary that it paid to judges during a judge's term).

　　　　　Unlike in Guerrero, the Williamson County Commissioners Court can

hire interim county constables,[9] Tex. Loc. Gov't Code § 87.041(a)(10), approve

---

[9] In their Objections, Defendants argue that the conclusion that appointing to fill a
vacancy equates to hiring is unsupported by any case law.  Although the Court has
been unable to locate a case which makes the statement explicitly, the finding
seems a natural extension of existing case law.  The definition of "employee"
under Title VII provides three major exemptions: (1) officials elected to public
office, (2) a person chosen by such officer to be on the officer's personal staff, or
(3) an appointee on the policymaking level.  42 U.S.C. § 2000e(f).  Courts interpret
the second exception as requiring that the person be appointed by an elected
official; a person appointed by someone other than an exempt elected official
would not be subject to the exception.  See Tranello v. Frey, 962 F.2d 244, 249 (2d
Cir. 1992) (finding that the plaintiff, who was appointed by the County Attorney,
who had been appointed by the elected County Executive, was not an exempt
appointee, even though he was an appointee); see also Oden, 246 F.3d at 468–69
(holding that an appointment was a hiring decision that could result in Title VII
liability).  Since appointment gives rise to liability unless the appointee comes
within the exception, it must equate to hiring under Title VII.

appointments of any deputy constable or other employee of the constable,[10] Tex. Loc. Gov't Code § 151.001, and assign responsibilities or duties to the constable, beyond those that are statutorily required, Griffin, 266 S.W.3d at 198.  As the Southern District of Texas has concluded in a slightly different context, "[t]his is analogous to a manager in a company applying to higher authority in the company for permission to hire an employee." Moore v. Harris Cnty., No. Civ. A. H-98-1776, at *7 (S.D. Tex. May 31, 2001).  Although the County Commissioners have no authority to fire a constable—only a state district judge may remove a constable from office,[11] Tex. Loc. Gov't Code § 87.012(12)—the County Commissioners nevertheless exercise a significant amount of control over interim county constables.

---

[10] In all counties, County Commissioners must give approval to a constable seeking to appoint a deputy.  Tex. Loc. Gov't Code § 151.001.  When a county has a population over 190,000, the County Commissioners must also give approval to the constable to appoint any employee. Id.  The Court takes judicial notice that Williamson County's population is over 190,000.  People QuickFacts, U.S. Census Bureau (May 29, 2015), http://quickfacts.census.gov/qfd/states/48/48491.html (estimating the 2013 population to be 471,225); Castilleja v. S. Pac. Co., 445 F.2d 183, 185 (5th Cir. 1971) (permitting the district court to take judicial notice of population).  Accordingly, the County Commissioners in Williamson County must approve any employee that the constable seeks to appoint.

[11] Lloyd argues that it is irrelevant that the County Commissioners cannot fire constables because Lloyd was not a constable at the time of the decisionmaking in the case.  (Dkt. # 48 at 5.)  Because the economic realities/common law control test examines the particular position as a whole, rather than in a certain moment in time, the authority to fire is relevant to the inquiry.

Moreover, just as in <u>Moore</u>, the economic realities here strongly favor a finding of employment relationship.  The County Commissioners Court sets the constable's compensation, expenses, and allowances annually, with very few limitations.[12]  Tex. Loc. Gov't Code § 152.011; <u>Harris Cnty. v. Walsweer</u>, 930 S.W.2d 659, 667 (Tex. App. 1996).  In light of the significant economic realities and the ability of the Commissioners Court to exercise control over nonelected constables, the Court agrees with the Magistrate Judge that there was an employment relationship sufficient to render the County Lloyd's employer for Title VII and TCHRA purposes.

b.   <u>Employee</u>

The parties also dispute whether Lloyd is an employee protected by the statute.  Williamson County argues that constables are not "employees" as defined within Title VII or TCHRA, both because constables are elected to public office and because they fit within Title VII's policymaker exception.  (Defs. MSJ at 18–19.)  Lloyd counters that Title VII and TCHRA only require that covered parties are "individuals," which he is, and that the policymaking exception is

---

[12] In their Objections, Defendants emphasize that constables do not accrue any type of leave time or enter any time into the County's time-keeping system, as other Williamson County employees do.  (Dkt. # 61 at 3 n.4.)  In light of the existing case law and the other facts in this case, the Court does not find the time accrual/time keeping factor significant to the analysis.

inapplicable because he had not yet been appointed to the policymaking position. (Id. at 6–7.)

As Lloyd points out, Title VII and TCHRA prohibit discrimination against "any individual."  However, status as a random individual is insufficient; both statutes require an employment relationship between the defendant and that individual to establish standing.  Diggs v. Harris Hosp.–Methodist, Inc., 847 F.2d 270, 271–72 (5th Cir. 1988); NME Hosps., 94 S.W.2d at 147 (requiring either a direct or indirect employment relationship between plaintiff and defendant).  The law is well-established that this type of employment relationship can include an individual seeking a position, e.g., Johnson v. Louisiana, 351 F.3d 616, 621–22 (5th Cir. 2003), but the position must be one that qualifies as an employee under the statute.  See Teneyuca v. Bexar Cnty., 767 F.2d 148, 150 (5th Cir. 1985) (holding that, in assessing the merits of a Title VII claim of an applicant for the position of Assistant Criminal District Attorney, the plaintiff had to show that the position was one that would qualify as an "employee" under the statutory definition).[13]

As discussed above, Title VII defines an employee as "an individual employed by an employer," with four exceptions: (1) an official elected by

---

[13] Because there is no Texas case law directly addressing this issue, the Court applies federal case law interpreting Title VII to TCHRA, and determines that the rule equally applies to TCHRA.  In re United Servs. Auto. Ass'n, 307 S.W.3d at 308.

qualified voters; (2) a person chosen by an elected officer to be on the officer's personal staff; (3) an appointee on the policy making level; and (4) an "immediate adviser with respect to the exercise of the constitutional or legal powers of the office." 42 U.S.C § 2000e(f). TCHRA defines an employee as "an individual employed by an employer," with one exception for an individual elected to public office in the state. Tex. Labor Code § 21.002(7).

> i.   Elected Official Exemption under Title VII and TCHRA

Williamson County first argues that the county constable position does not qualify as an employee because it fits within Title VII and TCHRA's exemption for elected public officials. (Defs. MSJ at 24.)

The present case presents a difficult fact pattern for the elected official exemption, since it is undisputed that a constable in Williamson County that took office in the traditional manner would not qualify as an employee, pursuant to the elected official exemption. See Tex. Loc. Gov't Code § 86.002. However, a question arises here because Lloyd applied for—and Stofle ultimately received—the position through appointment, rather than through election.

This is an issue of first impression that requires the Court to interpret the meaning of "elected to public office" under both Title VII and TCHRA. The Court does so in turn.

(A)    Title VII

Because of Title VII's silence in defining the meaning of the

employee exemptions, courts have looked to its legislative history in construing the

scope of the elected official, personal staff, and policymaker exemptions.  E.g.,

Gregory v. Ashcroft, 501 U.S. 452, 484 (1991) (White, J., concurring in part and

dissenting in part) (examining legislative history in evaluating whether state judges

fit within the policymaker exception); Teneyuca, 767 F.2d at 152 (examining

legislative history in deciding the scope of the personal staff exception (citing

Owens v. Rush, 564 F.2d 1370, 1375 (10th Cir. 1981)); E.E.O.C. v. New York,

729 F. Supp. 266 (S.D.N.Y. 1990) (examining legislative history in deciding

whether state judge fell within elected official exemption), reversed 907 F.2d 316

(2d Cir. 1990).  Accordingly, the Court first examines the legislative history and

then turns to the case law on point.

As originally passed, Title VII contained no exemptions and defined

employee only as "an individual employed by an employer."  Title VII—Equal

Employment Opportunity, Pub. L. No. 88-352, § 701(f), 78 Stat. 253.  For that

reason, in 1972, Senator Ervin introduced an amendment to exempt elected

officials and their immediate advisors from the definition of employee.  In his

view, the amendment was necessary to protect the federal judiciary from

encroaching on the people's ability to elect their own state officers:

> So Congress now can pass a bill like this one, that says that a Federal judge can remove a Governor from office—this is not what it says expressly, but what it means—or other elected official of a State or county from office, if that Federal judge finds that the voters of that State elected that Governor because they preferred a man of his race or a man of his religion or a man of his national origin or a person of his sex, rather than a person of some other race or religion or national origin or sex. . . . For that reason, I offer this amendment . . . to make certain that Federal judges cannot remove elected State and county officials from office or tell them whom they have to have as their selections to advise them with respect to their constitutional and legal responsibilities.

188 Cong. Rec. 1616.

Engaging in the debate on the amendment, Senator Williams similarly emphasized the relationship of the amendment with the people's right to elect their leaders:

> I certainly subscribe, and for many reasons, to the exclusion of the elected official at the State and local governing level.  His test comes at the polls rather than under a law of this nature.  I think that is certainly sufficient test as to propriety in the undertaking of his office, in view of the people that have the opportunity to select him for elected office.

Id. at 1631.

In debating the amendment, the senators discussed and Senator Ervin repeatedly emphasized its narrowness:

> I think that the point the Senator is driving at is that this is narrowly drawn to make certain that the only persons covered by the bill at a State or local level are elected officials and the people who advise them as to their constitutional and legal powers. . . . It would only exclude elected officials and those who give them advice as to how

37

they should carry out their legal and constitutional duties, and not
those who actually carry them out as administrative officials.

Id. at 1604, 1632 ("Mr. Williams.  But it is not the intention of the Senator's

amendment to go to the employees of the personal advisers to the elected officials;

is that not correct?  Mr. Ervin.  This amendment would not do that.  That is not its

intention.  I would like to do that, but I do not think I could persuade the Senate to

adopt an exclusion of that kind.  It is not its purpose to go to the employees of the

personal assistants or to the legal advisers.").

　　　　　The only other senator who commented on the amendment was

Senator Javits, "who said that he believed that elected officials were not

encompassed by the bill as originally proposed, but who had no quarrel with

making the exemption explicit."  E.E.O.C., 729 F. Supp. at 273.  All three

ultimately voted in favor of the amendment.  Id.

　　　　　Upon passage of the bill, the Conference Report summarized the

intent of the amendment as follows:

> It is the intention of the conferees to exempt elected officials and
> members of their personal staffs, and persons appointed by such
> elected officials as advisors or to policymaking positions at the
> highest levels of the departments or agencies of State or local
> governments, such as cabinet officers, and persons with comparable
> responsibilities at the local level.  It is the conferees intent that this
> exemption shall be construed narrowly.

118 Cong. Rec. 1834–36.

In sum, the legislative history makes clear that the exemption is a narrow one, motivated by the desire to leave elected positions to the discretion of the voters.  As the Southern District of New York has summarized:

> The only legislative history on point thus suggests that the words 'elected to public office' refer to someone who holds his present office because the voters elected him to it.  It also suggests that if a position is claimed to have both elective and appointive aspects, it should be categorized as 'elective' only if an inquiry into whether discrimination motivated the choice would require probing the motives of the electorate, and only if a finding of discrimination would result in the ouster of someone chosen for the position by the electorate.

E.E.O.C., 729 F. Supp. at 274.

The Southern District of New York applied that interpretation of the legislative history to assess whether a state judge who was initially elected to office was still considered an elected official subject to ADEA's exemption.[14]  E.E.O.C., 907 F.2d at 317.  In New York, elected state supreme court justices were subject to mandatory retirement at the age of 70.  Id. at 318.  However, retired justices could continue to perform the same judicial service as previously performed until age 76 if their physical and mental health was certified by the Administrative Board of the New York Courts every two years.  Id. at 319.  The plaintiff in the case was a retired justice alleging age discrimination after he was barred from recertification

---

[14] Because the ADEA contains the same exemption and is interpreted in light of Title VII's legislative history, the court analyzed Title VII's legislative history to address the scope of the exemption.  E.E.O.C., 729 F. Supp. at 272.

at the age of 76.  Id.  The district court ultimately concluded that, because the electorate had no voice in the certification process and only the motivations of the Administrative Board members would be relevant in a discrimination analysis, certificated supreme court justices were not elected officials under the ADEA. E.E.O.C., 729 F. Supp. at 275.

The Second Circuit ultimately reversed that holding, finding certificated supreme court justices to be elected officials under the law.  The court noted that the pool of justices eligible for certification was "derived and limited to those who were elected to the judicial office of justice of the supreme court"; in other words, "[o]nce certificated . . . a retired justice continues to serve by virtue of the election that made the justice eligible for certification."  E.E.O.C., 907 F.2d at 321.  The court distinguished certification from appointment on that basis: "[w]hile 'appointment' ordinarily entails a selection or designation to fill a public office or position . . . certification merely allows a retired elected justice to continue to 'perform the duties of a justice of the supreme court.'"  Id.  Citing to a New York Court of Appeals decision upholding a determination that certificated justices qualified under the elected officials exemption of the ADEA, the Court concluded that "the period of certification is a component of the elected term," and held that certificated supreme court justices were subject to the ADEA's exemption.

The circumstances at issue here are readily distinguishable.  Lloyd is not an employee who has been elected by the voters and now seeks to move into an extension of that position requiring separate appointment.  Lloyd has never been elected.  Although he could be elected in the future, the employment decision at the time of his application was completely separate from any election process.  Accordingly, the Court holds that Lloyd does not fall within the elected official exemption to Title VII.

(B)   TCHRA

TCHRA is similarly silent in defining who qualifies as an official elected for public office.  The language describing the elected official is virtually the same as that in the federal law, except that it specifies that the official must be elected to public office by the qualified voters of the state or its political subdivision.  Compare Tex. Labor Code § 21.002(7), with 42 U.S.C. § 2000e(f).

"The Legislature modeled the Texas Human Rights Act of federal law with the purpose of executing the policies embodied in Title VII of the federal Civil Rights Act of 1964."  Benavides v. Moore, 848 S.W.2d 190, 193 (Tex. App. 1992).  Because there is no Texas case law addressing this question, the Court must look to federal case law interpreting Title VII as a guide.  Id.  Given that federal case law relies on the legislative history of Title VII to interpret the definitions therein, and in light of the Second Circuit's interpretation of the elected

official exemption, the Court holds that Lloyd does not fall within the elected

official exemption to TCHRA.

ii.   Policymaking Exception under Title VII

Williamson County next argues that the county constable position

does not qualify as an employee under Title VII because it fits within the

exemption for employees who are "appointee[s] on the policy making level."  42

U.S.C. § 2000e(f).  At the outset, the Court notes that a parallel exemption does not

exist under TCHRA.[15]

---

[15] The definition of employee under TCHRA mirrored the federal definition until
1993, when the definition was narrowed by an amendment removing the personal
staff, policymaker, and adviser exceptions and specifically covering those
categories of employees.  Compare H.B. 14, 1983 Leg., 68th Sess. (Tex. 1983)
(enacted), with 42 U.S.C. § 2000e(f), and H.B. 860, 1993 Leg., 73d Sess. (Tex.
1993) (enacted).  See also Gomez v. City of Eagle Pass, 91 F. Supp. 2d 1000, 1003
(discussing the amendment).

The amendments created a new section of the Texas Labor Code,
§ 21.126, Coverage of Previously Exempt Employees of the State or Political
Subdivision of the State, which specifically covers the former exceptions:

It is an unlawful employment practice for a person elected to public
office in this state or a political subdivision of this state to
discriminate because of race, color, sex, national origin, religion, age,
or disability against an individual who is an employee or applicant for
employment to:
(1)  serve on the elected official's personal staff;
(2)  serve the elected official on a policy-making level;  or
(3)  serve the elected official as an immediate advisor with respect to
the exercise of the constitutional or legal powers of the office.

Title VII provides no definition as to who constitutes as a policymaker, and the Fifth Circuit has not specifically addressed the policymaking exception.  Circuits are split as to the breadth of the exemption.[16]

The majority of circuits that have addressed the issue favor a narrower reading of "policymaker," relying on statutory language and congressional intent. Invoking the statutory construction doctrine of noscitur a sociis, the Second and Tenth circuits found that because each category in the exception—apart from the policymaker category—clearly require a relationship to the elected official, it follows that Congress intended to limit policymakers to those working with or accountable to the elected official.  Butler v. N.Y. State Dep't of Law, 211 F.3d 739, 747 (2d Cir. 2000) (citing E.E.O.C. v. Vermont, 904 F.2d 794, 798 (2d Cir. 1990)); Anderson v. City of Albuquerque, 690 F.2d 796, 800 (10th Cir. 1982). Additionally, the circuits relied on the debate on the Ervin amendment, noting that Senator Ervin characterized the purpose of the amendment as narrowing the definition of employee to exempt elected officials "or any person chosen by such person to advise him in respect to the exercise of the constitutional or legal powers

---

[16] Title VII and the ADEA define employee, including the exemption provisions, with the same statutory language.  Compare 42 U.S.C. § 2000e(f), with 29 U.S.C. § 630(f).  Because the term has "been identically treated under the ADEA and Title VII," "cases interpreting the term[] under either statute may be considered."  See Coleman v. New Orleans & Baton Rouge S.S. Pilots' Ass'n, 437 F.3d 471, 479 n.7 (5th Cir. 2006).  Accordingly, the Court's discussion of various circuits' interpretations of the policymaker exception will address Title VII and ADEA cases interchangeably.

of his office," or, in other words, those "who are in a close personal and immediate relationship with" the elected official.  Vermont, 904 F.2d at 798–99; Anderson, 690 F.2d at 801.  The circuits also found significant that Congress discussed its intent to ensure that the "adviser" phrase could not be expanded to cover all of the employees of a particular elected office.  Vermont, 904 F.2d at 798–99; Anderson, 690 F.2d at 801.  Accordingly, the Second Circuit's test requires that the employee (1) be appointed by an elected official, and (2) the position work closely with or be accountable to the appointing body, see Butler, 211 F.3d at 747–49, and the Tenth Circuit's test requires that the employee (1) be appointed by an elected official, and (2) act as a policymaker.  Crumpacker v. Kan. Dep't of Human Res., 474 F.3d 747, 752 (10th Cir. 2007).

The Eighth Circuit's test is likewise narrow, but does not specifically require that the appointing authority be elected: rather, it looks to (1) whether the official has discretionary, rather than solely administrative, powers, (2) whether he serves at the pleasure of the appointing authority, and (3) whether he formulates policy.  Stillians v. State of Iowa, 843 F.2d 276, 278–79 (8th Cir. 1988), abrogated on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104 (1991).

Finally, the First Circuit also employs a relatively narrow test, although it does not require that the individual work closely with, be accountable

44

to, or serve at the pleasure of the appointing authority or an elected official.  The

court considered the legislative history of the exemption and found that the

Conference Report separates elected officials and their personal staff and advisers

from policymaking positions in a significant and definitive way:

> It is the intention of the conferees to exempt elected officials and
> members of their personal staffs, and persons appointed by such
> elected officials as advisors <u>or</u> to policymaking positions at the
> highest levels of the departments or agencies of State or local
> governments, such as cabinet officers, and persons with comparable
> responsibilities at the local level.

<u>E.E.O.C.</u>, 858 F.2d at 55–56 (quoting H.R. Conf. Rep. No. 92-899, at 15–16

(1972)).  Accordingly, the First Circuit test emphasizes the position of the

appointees within the government structure—particularly looking to the

employee's placement on the chain of command—rather than the particular duties

of those persons or their obligations to the appointing body.  <u>E.E.O.C. v.</u>

<u>Massachusetts</u>, 858 F.2d 52, 56 (1st Cir. 1988).

          The Seventh Circuit is something of an outlier, applying the same test

as that employed to determine whether employees are exempt from the First

Amendment's prohibition on political hiring and firing.  <u>Americanos v. Carter</u>, 74

F.3d 138, 144 (7th Cir. 1996).  That test analyzes "whether the position held by the

individual authorizes, either directly or indirectly, meaningful input into

governmental decision-making on issues where there is room for principled

disagreement on goals or their implementation."  Id. at 141 (internal quotation marks omitted).

Although the Fifth Circuit has not addressed the policymaker exception specifically, it has addressed the personal staff exception in detail, emphasizing the need to narrowly interpret the provision in light of the exception's legislative history.  Teneyuca, 767 F.2d at 152.  In Tenecyuca, the court relied on precedent from other circuits to identify factors that courts should consider in assessing the nature and circumstances of the employment relationship, and then went on to emphasize that the consideration of the factors "must be tempered by the legislative history, . . . which indicates that the exception is to be narrowly construed."  Id. at 152.  The court cited to the joint statement of intent in the conference report that the exception "'shall be construed narrowly,'" and then discussed Senator Ervin's comments in the debate that the purpose of the exception was to exempt elected officials and those "'who are in a close personal relationship and an immediate relationship with him.  Those who are his first line advisers.'"  Id.

Given the Fifth Circuit's reliance on case law consensus and legislative history in interpreting the personal staff exception, the Court finds the reasoning of the majority of circuits persuasive, and will examine whether Lloyd would have been an exempt policymaker by considering (1) whether the

46

nonelected constable position was appointed by an elected official, and (2) whether the nonelected constable position acted as a policymaker.[17]  In considering whether the position acted as a policymaker, the Court will look to the factors identified by the other circuits to determine the "nature and circumstances of the employment relationship between the complaining individual and the elected official to determine if the exception applies," Teneyuca, 767 F.2d at 152, including (1) how closely the official worked with or was accountable to the appointing body, Butler, 211 F.3d at 747–48; Crumpacker, 474 F.3d at 752; (2) the level of the official's authority in comparison to other employees, Butler, 211 F.3d at 748; Massachusetts, 858 F.2d at 56; (3) whether the official has discretionary, rather than solely administrative powers, Stillians, 843 F.2d at 278; and (4) whether the official formulates policy or provides meaningful input into governmental decisionmaking, Stillians, 843 F.2d at 278–79; Americanos, 74 F.3d at 144.

Here, it is undisputed that the interim county constable position was appointed by a body of elected officials: namely, the County Commissioners.  It is less clear, however, that the constable is the type of high-level policymaker that the

---

[17] Defendants argue in their Motion for Summary Judgment and reiterate in their Objections to the Magistrate Judge's Report and Recommendation that the appropriate test for the policymaker exception is set-out Gomez v. City of Eagle Pass, which uses the Eighth Circuit test.  91 F. Supp. 2d at 1004.  However, Gomez does not include any rationale as to why it relied on the Eighth Circuit test over the tests of the other circuits, and Gomez is not binding on this Court.

exemption envisions.[18]  Under Texas Law, a constable has the power to "execute

and return . . . each process, warrant, and precept that is directed to the constable

and is delivered by a lawful officer" and "attend each justice court held in the

precinct."  Tex. Loc. Gov't Code § 86.021; see also Griffin v. Birkman, 266

S.W.3d 189, 198 (Tex. App. 2008).  This is the extent of his "sphere of authority"

that is protected from invasion by state law; however, the Commissioners Court

has the discretion to assign other responsibilities or duties to the constable.  Griffin,

266 S.W.3d at 198.

---

[18] Both parties point to Frank v. Harris County, 118 F. App'x 799 (5th Cir. 2004), to assist the Court in determining whether the constable qualifies as a policymaker. At the outset, the Court notes that the opinion is unpublished and is not binding precedent.

In Frank, the plaintiff brought a Title VII sexual harassment claim against the elected county constable.  Id. at 802–03.  The court found that the county constable was not an employee of the county, since he came within Title VII's exemption for elected officials.  Id. at 803.  The plaintiff also brought a § 1983 claim against the county.  In finding that an issue of fact remained on the § 1983 claim, the court stated:

> As a matter of law in this Circuit, an elected county constable is not, absent specific facts not present in this case, the final policymaker such that his unconstitutional conduct may be chargeable against the county. . . . [The Constable's] testimony is not controlling on the issue of whether, as a matter of law, he was the final policymaker."  Id. at 802.

As the court makes clear, its commentary regarding the constable's status as a final policymaker is cabined to § 1983.  Despite the similar language, the policymaker standards in § 1983 and Title VII are distinct and have different meanings, and the Court cannot import the reasoning to apply here.

In Williamson County, Stofle, as the Precinct 3 constable, has the following additional duties: (1) instructing deputies to patrol for traffic violations and determining the amount of focus on running traffic; (2) determining extra duty policies; (3) conducting budget analysis; (4) developing a warrant payment system; (5) meeting with other constables to develop and implement policy; (6) setting the agenda for monthly constable meetings; (7) determining how to allot officers for the 440 square miles in his precinct; (8) creating an evidence room; (9) dictating that evidence audits be done; (9) determining staffing on warrants, civil service, and environmental investigations; (10) establishing a mission statement and values system; and (11) establishing a magnetometer in the annex facility.  (Defs. MSJ, Ex. K at 4.)

The range of these duties raises a question of material fact as to whether the nonelected constable position comes within the policymaker exception to Title VII.  See Teneyuca, 767 F.2d at 153 (noting that the "highly factual nature of the inquiry necessary to the determination of the 'personal staff' exception does not lend itself well to disposition by summary judgment").

2.    Religious Discrimination Claims

Because there is a question of fact as to whether Lloyd qualifies for the policymaker exception under Title VII and because Lloyd is not an exempt

employee under TCHRA, the Court will analyze whether Lloyd's Title VII and TCHRA claims can survive on the merits.

A plaintiff seeking to prove intentional discrimination under Title VII or TCHRA can proceed under one of two frameworks, based on whether there is direct evidence or indirect evidence of discrimination.  Wallace v. Tex. Tech Univ., 80 F.3d 1042, 1047–48 (5th Cir. 1996) (internal citations omitted); Quantum Chem. Corp v. Toennies, 47 S.W.3d 473, 476 (Tex. 2001).  Lloyd first argues that he can survive summary judgment on the direct evidence test; in the alternative, he argues that he also can survive summary judgment on the indirect evidence test.

a.     Direct Evidence Test

"Direct evidence is evidence which, if believed, proves the fact without inference or presumption."  Jones v. Robinson Prop. Grp., 427 F.3d 987, 992 (5th Cir. 2005).  "In the rare situation in which the evidence establishes that an employer openly discriminates against an individual it is not necessary to apply the mechanical formula of McDonnell Douglas to establish an inference of discrimination."  Moore v. United States Dep't of Ag., 55 F.3d 991, 995 (5th Cir. 1995).

Remarks can constitute direct evidence of discrimination when they state on their face that an improper criterion served as a basis for the adverse

employment action, id. at 993, or if they meet the four-part test set forth in Brown v. CSC Logic, Inc., 82 F.3d 651, 655 (5th Cir. 1996).  See also Laxton, 333 F.3d at 583 n.4 (noting that the CSC Logic test applies to determine whether a remark constitutes direct evidence of discrimination).  Under the CSC Logic test, a remark can be direct evidence of discrimination if it is "1) [religion] related; 2) proximate in time to the [adverse employment action]; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue."  333 F.3d at 655; see also Arismendez v. Nightingale Home Health Care, Inc., 493 F.3d 602, 607–08 (5th Cir. 2007) (applying the CSC Logic test in a case of pregnancy discrimination); Vance v. Union Planters Corp., 209 F.3d 438, 442 (5th Cir. 2000) (applying CSC Logic to sex discrimination).

i.    Religion-Related

Lloyd must first demonstrate that the remarks at issue were related to religion.  Title VII defines religion to mean "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).

Lloyd contends that, during his interview, the County Commissioners asked Lloyd questions related to his religion, including the church that he attended

and his views on same-sex marriage and abortion.  (Dkt. # 48 at 11.)  The Court

finds that the questions about which Lloyd complain were related to religion.

Membership in a particular church is natural part of religious observance.

Although abortion does not per se implicate religion, it can (and often does).

Compare Edwards v. Aguillard, 482 U.S. 578, 615–16 (1987) ("[W]e will not

presume that a law's purpose is to advance religion merely because it happens to

coincide or harmonize with the tenets of some or all religions . . . . We have, for

example, turned back Establishment Clause challenge to restrictions on abortion

funding and to Sunday closing laws, despite the fact that both agree with the

dictates of some Judaeo–Christian religions." (internal quotation marks, citations,

and editing marks omitted)), with Burwell v. Hobby Lobby Stores,

Inc., --- U.S. ----, 134 S. Ct. 2751, 2777 (2014) (finding that a position against

abortions was part of the company's sincerely held religious belief).  Similarly,

although same-sex marriage does not per se implicate religion, it can.  Compare

Boy Scouts of Am. v. Dale, 120 S. Ct. 2446, 2462–63 (2000) (noting that "a

number of religious groups do not view homosexuality as immoral or wrong and

reject discrimination against homosexuals"), with Lawrence v. Texas, 539 U.S.

558, 571 (2003) (noting that condemnation of homosexuality "has been shaped by

religious beliefs") and Obergefell v. Hodges, --- S. Ct. ----, 2015 WL 2473451, at

*22 (2015) ("[I]t must be emphasized that religions, and those who adhere to

religious doctrines, may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned.").

Here, Lloyd testified that answering the questions about abortion and same-sex marriage required him to disclose his religious beliefs. Moreover, he was specifically asked by Covey which church he attended. Long testified that she had a religious basis for her views on abortion and same-sex marriage and Birkman testified that she had a religious basis for her views on abortion. (Long Dep. at 13:16–14; Birkman Dep. at 12:5–7.) Together, this evidence—viewed in the light most favorable to Lloyd—is sufficient to satisfy the first prong of the test.

ii.   Proximate in Time

Second, Lloyd must demonstrate that the remarks were made proximate in time to the adverse employment action, which in this case was the decision not to hire Lloyd. See Tex. Dep't of Comty. Affairs v. Burdine, 450 U.S. 248, 253 (1981) (describing the adverse employment action at issue as applying for an available position or which the applicant was qualified and being rejected). Here, the remarks to Lloyd were made during the course of the interviews, which took place on the same day that the Commissioners made the hiring decision.[19] (See Dkt. # 16.) Accordingly, Lloyd meets the second prong of the test.

---

[19] Although the Commissioners also asked Stofle these questions, they asked the questions of him during his interview a month prior for the Justice of the Peace position. (Dkt. # 49, Ex. 30 at 28:14–17.)

   iii. <u>Made by an Individual with Authority over the</u>
     <u>Employment Decision at Issue</u>

  Third, Lloyd must show that the remarks were made by an individual

with authority over the hiring decision.  The record indicates that the questions

came from some combination of Long, Birkman, and Covey at Lloyd's interview.

All were voting members of the five-person group that made the ultimate hiring

decision.  Accordingly, Lloyd meets the third prong of the test.

   iv. <u>Related to the Employment Decision at Issue</u>

  Finally, Lloyd must show that the remarks were related to the

employment decision at issue.  Lloyd presents evidence showing that (1) Covey

took notes during the interview reflecting that Lloyd was not definitive enough

about same-sex marriage or abortion, (2) Birkman told Lloyd that he would need a

better answer about same-sex marriage to get the constable appointment, and

(3) Long and Covey frowned as though Lloyd had given the wrong answer when

he qualified his pro-life position.

  Defendant argues that the remarks could not have been related to the

employment decision at issue because there is no way to distinguish between

Lloyd and Stofle, the candidate that was ultimately hired, based on religion, since

they both were Christian.  The Court disagrees.  Under Title VII, the term

"'religion' includes all aspects of religious observance and practice, as well as

belief."  42 U.S.C. § 2000e(j).  Given that this term includes religious practice

beyond specific religious categories, the Court finds that alleged differences in

religious beliefs between Lloyd and Stofle are significant for Title VII purposes.

See Davis v. Fort Bend Cnty., 765 F.3d 480, 485 (5th Cir. 2014) ("[A] court's task

is to decide whether the individual's beliefs are, in his own scheme of things,

religious." (internal editing marks and citations omitted)).

      Viewing the evidence in the light most favorable to Lloyd, there is a

question of fact as to whether the remarks were related to the Commissioners'

decision not to hire Lloyd.[20]  Because Lloyd has set forth sufficient evidence to

raise a genuine issue of material fact regarding direct discrimination, the Court

**DENIES** summary judgment to the County on the Title VII and TCHRA claims.[21]

---

[20] Defendants object that Lloyd must prove he was "clearly better qualified" for the
position than Stofle to succeed in his claim.  (Dkt. # 74 at 5.)  The clearly better
qualified inquiry is a way to demonstrate that a proffered legitimate,
nondiscriminatory reason for the hiring decision is nonpretextual at the pretext
stage of a circumstantial evidence-based McDonnell Douglas test.  See Price v.
Fed. Exp. Corp., 283 F.3d 715, 723 (5th Cir. 2002).  Because Lloyd can withstand
summary judgment based on direct evidence, the Court need not address whether
there is sufficient evidence of pretext.  Any evidence as to Lloyd's qualifications
for the position is relevant for the jury's determination of whether discriminatory
animus motivated or was a motivating factor in the failure to hire.  Desert Palace,
Inc. v. Costa, 539 U.S. 90 (2003); Tex. Labor Code § 21.125(a).

[21] Because the Court finds that Lloyd has met his burden in showing direct
evidence of discrimination at the summary judgment stage, the Court does not
address whether Lloyd produced sufficient evidence to support a showing of
circumstantial evidence of discrimination under the McDonnell Douglas
framework.

C.    Federal Constitutional Claims

Next, Lloyd alleges that Williamson County violated his First and Fourteenth Amendment rights by failing to hire him for the interim county constable position.  (Am. Compl. ¶¶ 24–25.)  The individual defendants contend that dismissal of the claims is proper because (1) they are entitled to qualified immunity, and (2) there was no constitutional violation.  (Defs. MSJ at 26–39; Gattis MSJ at 6–13.)  Williamson County contends that dismissal of the claims is proper because a majority of its members did not vote based on improper motives and therefore municipal liability is barred.  (Dkt. # 55 at 6.)

In his Report and Recommendation, the Magistrate Judge found that qualified immunity did not bar Lloyd's First Amendment Retaliation claim and that there was a question of fact as to whether the majority of the Commissioners acted on improper motives.  (R&R at 31–39.)  Additionally, the Magistrate Judge concluded that Defendants made no argument regarding the First Amendment free expression and association claims, the religious free exercise and establishment claims, and the federal right to privacy claim.  (Id. at 40.)  Accordingly, the Magistrate Judge recommended that the Court deny Defendants' Motions for Summary Judgment on the federal constitutional claims.  (Id.)

Defendants object that (1) Williamson County cannot be liable for the conduct of two Commissioners and was wrongly denied municipal liability; (2) the

individual defendants were wrongly denied qualified immunity; (3) there was no

underlying constitutional violation; and (4) they did move for summary judgment

on the additional constitutional claims on the basis of municipal liability, qualified

immunity, and causation.  (Dkt. # 61 at 10–19.)  Additionally, Defendant Gattis

objects that (1) the First Amendment claims and state and federal privacy claims

should have been dismissed based on the Magistrate Judge's rejection of the failure

to intervene theory; (2) he was entitled to qualified immunity; and (3) there was no

genuine issue based on the record as a whole.  (Dkt. # 60 at 3–11.)  Because

Defendants object to the Magistrate Judge's findings regarding the federal

constitutional claims, the Court reviews the findings de novo.

       1.   <u>Individual Defendants</u>

      "The doctrine of qualified immunity protects government officials

from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would

have known.  Qualified immunity gives government officials breathing room to

make reasonable but mistaken judgments, and protects all but the plainly

incompetent or those who knowingly violate the law."  <u>Thompson v. Mercer</u>, 762

F.3d 433, 436–37 (5th Cir. 2014) (internal quotation marks and citations omitted).

      Once a defendant has raised the qualified immunity defense, the

burden shifts to the plaintiff to show a violation of a clearly established

constitutional right.  Harris v. Serpas, 745 F.3d 767, 771 (5th Cir. 2014).

Accordingly, "[w]hen a defendant pleads qualified immunity as an affirmative

defense and moves for summary judgment on that basis, a court must decide

(1) whether the facts alleged or shown by the plaintiff made out a violation of a

constitutional right, and (2) whether that right was 'clearly established' at the time

of the defendant's alleged misconduct."  Ontiveros v. City of Rosenberg, 564 F.3d

379, 382 (5th Cir. 2009).  "Courts may address these two elements in either order,

and need not proceed to the second where the first is resolved in the negative."

Thompson, 762 F.3d at 437.

      Lloyd alleges that Defendants violated his First Amendment rights

against retaliation, as well as general First Amendment rights of free expression,

association, and religion and Fourteenth Amendment privacy rights.  The Court

addresses qualified immunity with respect to each claim in turn.

a.    First Amendment Retaliation Claim

i.    Whether There Was a Constitutional Violation

      To make out a claim of retaliation under the First Amendment, the

plaintiff must show, as a threshold question, that he made the speech in question as

a private citizen, rather than as an employee pursuant to his official duties.

Garcetti v. Ceballos, 547 U.S. 410, 417 (2006); Culbertson v. Lykos, --- F.3d ----,

2015 WL 3875815, at *5 (5th Cir. June 22, 2015).  If he did, the plaintiff must also

58

demonstrate that: (1) he suffered an adverse employment action; (2) the speech

involved a matter of public concern; (3) the plaintiff's interest in commenting on

matters of public concern outweigh the defendant's interest in promoting

efficiency; and (4) the speech motivated the defendant's action.  Culbertson, 2015

WL 3875815, at *4 (quoting Kinney v. Weaver, 367 F.3d 337, 356 (5th Cir. 2004)

(en banc)).

   Once a plaintiff has met the "burden of showing that his protected

speech was a substantial or motivating factor in the defendant's adverse

employment decision, a defendant may still avoid liability by showing, by a

preponderance of the evidence, that it would have taken the same adverse

employment action even in the absence of the protected speech."  Haverda v. Hays

Cnty., 723 F.3d 586, 591–92 (5th Cir. 2013) (citing Mt. Healthy City Sch. Dist.

Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).  "An employee can, however,

refute that showing by presenting evidence that 'his employer's ostensible

explanation for the discharge is merely pretextual.'"  Id. at 592 (quoting Coughlin

v. Lee, 946 F.2d 1152, 1157 (5th Cir. 1991)).

(A)  The Prima Facie Case

   Defendants do not argue that Lloyd made the speech as an employee

pursuant to his official duties, so the Court assumes the threshold question is

established.  Although Defendants suggest in a parenthetical[22] that they believe

that Lloyd has failed to establish all of the elements of the prima facie case, they

only present arguments related to the adverse employment action and motivating

factor elements.  (Defs. MSJ at 27–30.)  Accordingly, for the purposes of summary

judgment, the Court assumes that the second and third elements have been met and

only addresses the remaining two elements.  See Fed. R. Civ. P. 56(a) (movant

bears the burden of showing that he is entitled to judgment as a matter of law).

(1)   Adverse Employment Action

In the context of First Amendment retaliation, "[a]dverse employment

actions are discharges, refusals to hire, refusals to promote, and reprimands."

Harrington v. Harris, 118 F.3d 359, 365 (5th Cir. 1997) (internal quotation marks

omitted).  It is undisputed here that Lloyd sought the position of constable for

Precinct 3 and was not selected to fill the position.  Nevertheless, Defendants

contend that there was no adverse employment action because persons elected to

public office and appointees on the policymaking level are not employees as

defined by Title VII, and therefore there was no failure to hire that constituted an

adverse employment action.  (Defs. MSJ at 28.)

---

[22] Near the end of their Motion for Summary Judgment in their qualified immunity
section, the Remaining Defendants list the elements for a First Amendment
Retaliation claim and state, "Yet, even if Plaintiffs could demonstrate these
elements (which they cannot), Defendants are entitled to qualified immunity for a
First Amendment violation if they can show they would have taken the same action
even without the protected speech."  (Defs. MSJ at 44.)

Title VII is a specific statutory framework with its own definitions. Accordingly, whether the constable qualifies as an employee for the purposes of Title VII does not dictate whether Lloyd experienced an adverse employment action for the purpose of a § 1983 First Amendment claim.  Banks v. E. Baton Rouge Parish Sch. Bd., 320 F.3d 570, 580 (5th Cir. 2003) ("We recognize that § 1983's definition of adverse employment action may be broader than Title VII's definition, which limits the meaning of adverse employment action to ultimate employment decisions.").  Nonetheless, even if the Title VII definition of employee was controlling in the First Amendment context, the Court has previously addressed the elected official exception to Title VII and found that the interim appointed constable position was not an elected position.  Accordingly, the only part of Defendants' argument that the Court will address is the policymaker exception.

The seminal cases on First Amendment retaliation are Elrod v. Burns, 427 U.S. 347 (1976) and Branti v. Finkel, 445 U..S. 507 (1980).  In light of the plurality and concurring opinions, lower courts read Elrod to mean that government officials could not discharge a public employee on the basis of his political beliefs, unless the employee was in a policymaking or confidential position.  E.g., Stebmaier v. Trammell, 597 F.2d 1027, 1033 (5th Cir. 1979).  However, following language in Branti that "dismiss[ed] the labels 'confidential'

61

and 'policymaker' as irrelevant," the Fifth Circuit abandoned the policymaking

exception.  Barrett v. Thomas, 649 F.2d 1193, 1200 (5th Cir. Unit A 1981).

Instead:

> [T]he question is whether the hiring authority can demonstrate that
> party affiliation is an appropriate requirement for the effective
> performance of the public office involved.  The term  'confidential'
> and 'policymaker' illuminate the contours of the employee class that
> may permissibly be subjected to a political litmus test, but any
> specific application of the exception must turn on the importance of
> political loyalty to the execution of the employee's duties.

Id. at 1200–01.

Accordingly, Lloyd's classification as a policymaker would have no

bar on his ability to seek First Amendment relief under § 1983.  To the extent a

policymaking role is relevant, it is properly analyzed at the balancing stage of the

analysis.  Id.; see also Kinney, 367 F.3d at 368 (holding that it is the existence of

the power to affect employment—rather than "mere labels describing

governmental relationships"—that determine whether an adverse employment

action has occurred).

Because Plaintiff has demonstrated that Lloyd was not appointed to

the interim county constable position, he has sufficiently demonstrated an adverse

employment action.  See Peyton v. City of Yazoo City, 764 F. Supp. 2d 831, 838

(S.D. Miss. 2011) (assuming that failure to hire plaintiff as city clerk was sufficient

to demonstrate an adverse employment action).

(2)    Whether Speech Motivated Action

If the plaintiff is able to establish that he engaged in protected speech, he must also demonstrate that the protected speech was a motivating factor in the adverse employment action.  Beattie v. Madison Cnty. Sch. Dist., 254 F.3d 595, 601 (5th Cir. 2001).  Whether the speech motivated the action is a question of fact. See Connick v. Myers, 461 U.S. 138, 147–48 n.7 (1983); Branton v. City of Dall., 272 F.3d 730, 739 (5th Cir. 2001).

Defendants argue that Lloyd cannot demonstrate causation because he testified that he did not know how Stofle's answers differed from his answers; why the Commissioners would have been motivated to treat him adversely because of his answers; which religion the Commissioners were, where they attended church, or whether those answers differed from his; why an all-Republican Commissioners Court would negatively view his Republican voting record; what their positions were on abortion or same-sex marriage; or any other instance where someone on the Court had said anything negative about someone because of their views on those issues.  (Defs. MSJ at 35–36.)  Instead, Defendants argue that the only basis for Lloyd's claim is that he considered himself most qualified for the position, he was not chosen as the interim county constable, and he had to answer the questions involving protected speech.  (Id. at 36.)  Additionally, Defendants argue that, since Morrison and Gattis did not ask any of the questions at issue, Plaintiff pins liability

on Morrison and Gattis through a failure to intervene theory, which is not available to show causation in the First Amendment retaliation context.  (Defs. MSJ at 38; Gattis MSJ at 8–11.)  Gattis also argues that he cannot be liable in any supervisory capacity over the Commissioner's Court.  (Gattis MSJ at 51.)

Lloyd counters that the evidence set forth gives rise to a question of fact as to whether the speech motivated the Commissioners' failure to hire him for the interim county constable position.  In support of liability for Birkman, Long, and Covey, Lloyd presents evidence showing that: (1) Covey took notes during the interview reflecting that Lloyd was not definitive enough about same-sex marriage or abortion, (2) Birkman told Lloyd that he would need a better answer about same-sex marriage to get the constable appointment, and (3) Long and Covey frowned as though Lloyd had given the wrong answer when he qualified his pro-life position.  Additionally, Long testified that she considered all answers to all questions asked in the interviews in making her hiring decision, and Birkman testified that all questions asked in the interview mattered to her.[23]  (Long Dep. 16:17–17:1; Birkman Dep. 24:14–18.)  Given the close temporal proximity of the questions to the ultimate hiring decision, and viewing the evidence in the light most favorable to Lloyd, this evidence is sufficient to establish a question of fact as

---

[23] Defendants also argue that they testified that they did not base their vote on any of the finalists' answers to the questions at issue without a record citation.  (Defs. MSJ at 36.)

to whether the protected speech motivated the decisionmaking of Birkman, Long, and Covey.

No party objects, and the Court agrees with the Magistrate Judge, that, to the extent Lloyd seeks to hold Morrison or Gattis liable on a failure to intervene theory, summary judgment is granted against Lloyd on that claim.[24] Nonetheless, Lloyd contends that both Morrison and Gattis are individually liable for First Amendment retaliation based on their decision not to appoint Lloyd as interim county constable because they were present when the questions were asked and could have considered those questions in making their decision.

In support of liability for Morrison, Lloyd points to the following evidence: (1) Morrison's testimony that if an applicant was not Christian, "[i]t could factor" into his vote for the constable appointment;[25] (2) Morrison heard the answers to the questions at issue, which he testified took 30 to 40% of each interview; and (3) Morrison ultimately voted against Lloyd. (Dkt. # 48 at 39–40.) Additionally, Morrison testified that he did not ask the questions at issue because they were already asked and that he accepted the questions asked by Birkman,

---

[24] As the Magistrate Judge notes, "Plaintiffs have disavowed they are seeking to impose liability" under such a theory. (Dkt. # 58 at 35 n.17.)

[25] Morrison later testified that the questions about the applicant's beliefs about abortion, gay marriage, religion, voting record, and their church did not affect his decision, although he stated, "[b]ut I know those questions get asked when they're out on the campaign trail." (Morrison Dep. 61:2–22.)

Covey, and Long because they were appointing someone who was probably going to be running for office.  (Morrison Dep. 16:19–24)

In support of liability for Gattis, Lloyd points to the following evidence: (1) Gattis's testimony that he did not feel it necessary to ask the questions at issue in part because they had already been asked and in part because he could have ascertained the answers to those questions without asking the questions; (2) Gattis's testimony that he thought the questions were reasonable because it was a political appointee position; and (3) Gattis ultimately voted against Lloyd.[26]  (Dkt. # 48 at 40–42.)

Viewing the evidence in the light most favorable to Lloyd, the Court agrees with Lloyd that "[w]hile Gattis and Morrison both claim they did not rely on any part of all they learned about Plaintiffs' churches, religions, voting records, and views about abortion and same-sex marriage, a factfinder is entitled to disbelieve their claims."  (Dkt. # 48 at 42.)  Accordingly, there is a question of fact as to whether the remarks were related to the Morrison and Gattis's decision not to hire Lloyd.

---

[26] The Court does not credit Lloyd's argument that it is significant that Gattis was "leading the process of each interview for the Commissioners Court," or that he "opened the door for each applicant into the interview room, asked the first questions, and then passed the questioning on to his colleagues."  (Dkt. # 48 at 41.) As discussed above, Gattis had no duty to intervene, and is legally responsible only for the First Amendment retaliation that he himself allegedly perpetrated by choosing not to hire Lloyd.

(B)    <u>Same Employment Action and Pretext</u>

Once a plaintiff has established a prima facie case of First Amendment retaliation, the defendant can rebut that showing by producing evidence that the adverse employment action would have nevertheless occurred. <u>Haverda</u>, 723 F.3d at 591–92.  The plaintiff can rebut that showing by producing evidence that the reasons provided were pretextual.  <u>Id.</u> at 592.

Defendants point to various facts to demonstrate that, regardless of the answers to the questions at issue, the Commissioners would have appointed Stofle. (Defs. MSJ at 38.)  Plaintiffs argue that those reasons are pretextual.

Long testified that, after the interviews, she decided that she wanted to vote for Stofle.  (Long Dep. 82:14–17.)  She testified that she received a good recommendation about Stofle prior to the Justice of the Peace interview from the Williamson County Sheriff.  (<u>Id.</u> at 32:1–33 21.)  She also testified that, based on Lloyd's answer about leaving the Round Rock Police Department, she thought that he "was looking for an easier job, one that was less demanding" and that he was lazy.  (<u>Id.</u> at 73:19–74:5.)  Additionally, she testified that she was concerned about Lloyd running a funeral escort service at the same time that he held office.  (<u>Id.</u> at 74:20–75:10.)

Covey testified that, in making her decision, she relied on the candidates' experience, qualifications, the way they presented themselves, and

their answers to questions during the interviews.  (Covey Dep. 31:9–16.)  She

testified that she had known Stofle for many years (id. at 108:23–25) and that she

spoke to the Georgetown Police Chief, who recommended Stofle (id. at

131:16–25).  Additionally, she testified that when they selected the applications for

interviews, she and Judge Gattis debated including Lloyd in the list of candidates

(id. at 69:8–12), that during the interview, Lloyd had a hard time explaining his

views (id. at 34:2–10), and that she was concerned that he left the Round Rock

Police Department quickly (id. at 62:9–20).  Following the interview, it was her

impression that Lloyd was not looking for an active job and was just looking for a

job that he could retire on.  (Id. at 103:16–20.)

Birkman testified that she knew Stofle, first as a supervisor of

detectives in her grandmother's murder investigation, then as Assistant Chief in

Georgetown, and then as Emergency Management Coordinator, and she "found

him to be a good worker and an honorable man."  (Birkman Dep. 140:21–141:17.)

She further testified that the County's Emergency Management Coordinator, the

County's Sheriff, Georgetown's Mayor, and a Round Rock Police Sergeant all

supported Stofle's appointment, and that the Chair of the Republican Party in

Williamson County indicated that he thought Stofle would be easily electable.  (Id.

at 55:1–24, 106:8–107:15, 122:2–25, 137:11–21.)  She was concerned about the

TMPA Survey that indicated the Georgetown Police had issued a vote of no

68

confidence against Stofle, but she addressed her concern with a police sergeant, who indicated that the vote was really aimed at the police chief and that he personally felt Stofle was a good supervisor.  (Id. 122:2–25.)

           With regard to Lloyd, Birkman testified, "In general, my impression was he gave a poor interview and he was the worst of the candidates."  (Id. at 20–21.)  She testified that she found Lloyd's answers to questions in general vague and difficult to understand, that he was not well-spoken or definitive, he did not display leadership qualities, and he was evasive on some interview questions.  (Id. at 180:1–182:22, 193:1–12.)  She was also not clear that he met the residency requirements, or that he would be able to fully perform his constable duties while running his funeral escort service.  (Id. at 127:1–128:19, 197:6–198:4.)  She received two negative recommendations regarding Lloyd, one from her assistant, who knew him personally and relayed that he was not well-regarded in the police community and would not be a good constable, (id. at 89:15–25, 92:11–25), and one from the Round Rock Police Sergeant, who told her that Lloyd ended his work there because he was having an affair with an employee, that Lloyd was lazy, and that he was not a good police officer.  (Id. at 118:3–119:14.)  Although Birkman received two positive reviews, she did not credit them: the first was from the employee with whom he allegedly had an affair, and the second was from an employee at the funeral escort service.  (Id. at 114:–115:25, 127:1–128:19.)

Gattis testified that he relied on the applicants' law enforcement experience, community involvement, and knowledge in the field in making his hiring decision.  (Gattis Dep. 23:4–11.)  Additionally, he testified that he did not think Lloyd was "a strong candidate at all," although he did think that his experience, education, and background fit the position.  (Id. 43:1–20.)

Morrison testified that he chose Stofle because Stofle had come in second for the Justice of the Peace appointment shortly before the Constable appointment, and he did not find anyone that he liked better than Stofle in terms of his answers, his presence, and his personality.  (Morrison Dep. 14:22–25:9.)  He also testified that one specific answer from Lloyd "was of huge influence" on his decision: in response to the question as to why he was seeking the constable job, Lloyd indicated that he wanted to get off police work and into an administrative position, which Morrison interpreted to mean that Lloyd did not have the energy for the position.  (Id. at 69:1–19.)

Lloyd argues that the rationale offered is pretext to cover up unconstitutional motives in the hiring decision.  Specifically, Lloyd argues that (1) the Commissioners asked each of the candidates for the Constable position the questions at issue, which suggests they were of some importance in making their decision (Long Dep. 71:19–73:5; Covey Dep. 110:5–111:24; Gattis Dep. 64:11–22; Birkman Dep. 28:9–20; Lloyd Dep. 164:15–167:5, 170:6–17; Churchill

Dep. 106:19–107:20, 12:2–113:18; Goodrich Dep. 91:18–92:22, 117:1–118:13,

120:22–121:5); (2) the Commissioners asked each of the candidates for the Justice

of the Peace position the questions at issue regarding same-sex marriage and

abortion and also asked at least Stofle his religion, church membership, and

political affiliation, which again suggests that the questions were at least of some

importance in making the decision (Birkman Dep. 28:12–20; Gattis Dep.

64:11–22); and (3) at least Gattis and Covey were aware, prior to making the

constable hiring decision, that Stofle was demoted in 2010 from his Assistant Chief

position with the Georgetown Police Department following the TPMA Survey

reflecting high levels of disapproval of Stofle within the Department, and that

Stofle was suspected to have taken an intoxicated friend home after she crashed her

vehicle in 2006, although he was never charged for that conduct or disciplined

(Covey Dep. 133:9–13, 135:15–21; Gattis Dep. 84:1–4, 85:21–24, 86:21–87:8;

Dkt. # 48, Ex. 13, Att. A–C).[27]  Additionally, Lloyd presents evidence that he

worked as a deputy constable in Precinct 3, he was a 26-year veteran police

sergeant in Texas, he had 16 years of experience as a front-line supervisor, he had

---

[27] Plaintiff also argues that "To begin with, if Mr. Stofle was so qualified and
Defendants were not relying on religious and moral beliefs, why did Defendants
choose to appoint a pastor with no law enforcement or legal experience . . . over
Mr. Stofle as Justice of the Peace?"  (Dkt. # 48 at 45.)  Because the hiring decision
for the Justice of the Peace position was a completely separate hiring decision with
a separate pool of applicants, Stofle's ranking in that pool is irrelevant to the issue
at hand.

nearly 3,500 hours of peace officer and law enforcement training, and received awards for his public service, including Officer of the Year in Williamson County in 1995.  (Dkt. # 48, Ex. 2, Att. A at 4.)

Finally, Plaintiff presents an affidavit from Eddie Hurst, who was interested in volunteering for open board positions in 2008; interviewed with Long; was asked by Long where he went to church, whether he was as conservative as she was, his opinion on abortion, and his beliefs about homosexuality; felt that Long clearly indicated he had answered the questions wrong and abruptly ended the interview; and ultimately did not receive an appointment.  (Dkt. # 48, Ex. 14, Att. A.)

While the evidence of pretext is not substantial, in light of the Fifth Circuit's jurisprudence concluding that "summary disposition of the causation issue in First Amendment retaliation claims is generally inappropriate," the Court concludes that there is a question of fact as to whether a constitutional violation occurred in this case.

ii.      Whether the Right Was Clearly Established

Despite the question of fact as to whether the constitutional violation occurred, summary judgment is nevertheless appropriate unless the right was clearly established at the time of the incident.  Defendants argue that there is no law demonstrating that officials cannot rely on speech implicating a job

72

candidate's electability, such as party affiliation, abortion, and views on same-sex marriage, when that candidate is being appointed to fill a vacant elected position. (Defs. MSJ at 34.)  Defendants invoke the Branti exception to argue that even officials who do not face potential reelection, but are responsible for carrying out elected officials' policies, can be asked questions about political affiliation.  (Id. at 35–36.)  Lloyd counters that the Fifth Circuit has been clear since 1988 that retaliating against an employee for exercising First Amendment rights would subject them to civil liability.  (Dkt. # 48 at 58.)

In assessing whether a right is clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).  It is not necessary that the very action in question have "previously been held unlawful"; it is sufficient that the unlawfulness of the official action be apparent "in the light of pre-existing law." Id. at 640.  The focus of the inquiry "should be on 'fair warning': qualified immunity is unavailable . . . so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." Wernecke v. Garcia, 591 F.3d 386, 393 (5th Cir. 2009) (internal quotation marks omitted).

Most cases addressing qualified immunity in the First Amendment retaliation context fit into three categories.  Most commonly, cases fit into the first

category, in which the court asks whether it was clearly established that the speech at issue was protected under the First Amendment, and the inquiry ends.  E.g., Lane v. Franks, 134 S. Ct. 2369, 2382–83 (2003) (holding that Eleventh Circuit precedent had not clearly established that "subpoenaed testimony concerning information acquired through public employment is speech of a citizen entitled to First Amendment protection"); Alexander v. Eeds, 392 F.3d 138, 147 (5th Cir. 2004) (denying qualified immunity because it was clearly established that "[r]eporting serious police misconduct or corruption" was protected First Amendment activity); Izen v. Catalina, 382 F.3d 566, 574 (5th Cir. 2004) (denying qualified immunity because it was clearly established that "undertaking a prosecution 'in retaliation for or to deter the exercise of constitutionally protected rights'" was a violation of the First Amendment); Noyola v. Tex. Dep't of Human Resources, 846 F.2d 1021, 1024–26 (5th Cir. 1988) (noting that, even if the speech was the type of speech that the First Amendment would protect, it was not clearly established that speech about the welfare department's ability to properly serve the public was protected).

Less commonly, the inquiry continues along one of two separate paths.  In cases involving general speech, cases fit into a second category, in which the court also considers whether it was clearly established that an adverse employment action occurred at all—a question which is contingent upon the

employment relationship between the parties.  E.g., Kinney, 367 F.3d at 367–68 (addressing qualified immunity where the adverse employment action was boycotting the classes of the plaintiff-teachers at the police training academy in retaliation for the teachers' adverse court testimony, and concluding that it was unreasonable for the officers to believe "they were unfettered by the First Amendment merely because their economic relationship with [the plaintiffs] was non-employment and non-contractual").  In that context, the Fifth Circuit has held that the power to deny significant employment benefits, "not mere labels describing governmental relationships," is the relevant inquiry for a First Amendment retaliation analysis, and it is clearly established that when such a power exists, First Amendment protections apply.  Id. at 368.

Alternatively, in Elrod-Branti cases involving political speech, cases fit into a third category, where the court also considers whether it was clearly established that the job that the plaintiff held was the type of position exempted from First Amendment protection.  See, e.g., Gentry v. Lowndes Cnty., 337 F.3d 481, 487–88 (5th Cir. 2003) (concluding that the plaintiff-road manager held the type of position that was protected by the Elrod-Branti line as exempt, but that regardless, the defendants would have been entitled to qualified immunity because a sufficiently analogous situation had never been addressed); Gunaca v. Texas, 65 F.3d 467 (5th Cir. 1995) (finding qualified immunity appropriate because it was

not clearly established whether the political patronage exception applied to investigators in district attorney's offices or sufficiently analogous circumstances). Like in the first category of cases, these cases require a case-specific consideration of the particular position and the balancing of interests.

The parties in the instant case essentially talk past one another on the qualified immunity issue because Lloyd's arguments focus on the first category— that it was clearly established that the speech at issue was protected—while Defendants' arguments focus on the third—that it was not clearly established that this was the type of position exempt under the Elrod-Branti line.

Lloyd argues that the Fifth Circuit has been clear since 1988 that retaliating against an employee for exercising First Amendment rights would subject the employer to civil liability. (Dkt. # 48 at 58.) Although Lloyd is certainly correct, Supreme Court guidance as set forth in Lane v. Franks requires a deeper look to determine whether it was clearly established that the particular speech was protected by the First Amendment. See Lane, 134 S. Ct. at 2382–83.

An examination of Lane is instructive. The plaintiff in Lane was a director of a program for underprivileged youth operated by the county's community college, who eventually terminated an employee who was on the payroll but had not been reporting to work. When that employee was indicted on charges of mail fraud and theft, the plaintiff testified under subpoena regarding the

employee's termination.  Id. at 2375.  Meanwhile, the program was experiencing

significant budget shortfalls and the president of the community college decided to

terminate 29 employees, including the plaintiff.  Id. 2376.  Shortly thereafter, the

president rescinded all but 2 of the 29 terminations.  Id.  The plaintiff was one of

the two that remained terminated.  Id.  The plaintiff brought suit against the

president of the community college for termination in retaliation for his court

testimony.  Id.

    The Court ultimately concluded that, although the plaintiff's speech

was entitled to First Amendment protection, the Eleventh Circuit's precedent had

not been sufficiently clear to establish that right for the purpose of qualified

immunity.  Id. at 2383.  The Court looked to three Eleventh Circuit cases.  The first

"involved a public employee's subpoenaed testimony," in which the Eleventh

Circuit had concluded that the testimony was protected speech and that the relevant

constitutional rules were clearly established.  Id. at 2382.  The second "involved a

public employee's subpoenaed testimony in her co-worker's sexual harassment

lawsuit," in which the court also concluded the speech was protected.  Id.

However, in the third case, which was decided after the others, the court found

there was no First Amendment protection for the plaintiff's testimony because "the

plaintiff's decision to testify was motivated solely to comply with a subpoena."  Id.

The Court concluded that Eleventh Circuit precedent "did not provide clear notice

that subpoenaed testimony concerning information acquired through public employment is speech of citizen entitled to First Amendment protection," and therefore qualified immunity was appropriate.  Id. at 2382–83.

(A)    Speech About Religious Affiliation

There is a wealth of authority clearly establishing that it is a "constitutionally discredited policy" to "limit[] public offices to persons who have, or perhaps more properly profess to have, a belief in some particular kind of religious concept," Torasco v. Watkins, 367 U.S. 488, 494 (1961).  Without question, any decision relying on Lloyd's religious affiliation, as related by his Catholic church membership, would violate clearly established First Amendment jurisprudence, unless that decision was somehow outside the scope of protection because of the employment relationship's effect on the adverse employment action. The relationship here was a hiring decision: the Commissioners put out a call for applications, they selected applicants for interviews, and ultimately appointed—or, in other words, hired—an interim county constable.  Their ability to deny this significant employment benefit is the issue, and in light of Kinney, which made clear that the power, not the label on the relationship, is dispositive, Defendants should have been on notice that they would have needed a weighty governmental interest to balance Lloyd's interest in his First Amendment rights.  See Kinney, 367 F.3d at 368–69 (citing Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr,

78

518 U.S. 688 (1996) and O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712 (1996)).[28]  Accordingly, it was clearly established that Lloyd's speech related to his church membership was protected under the First Amendment from retaliation.

(B)    Speech About Same-Sex Marriage and<br>Abortion

As discussed in the Title VII context, the Court has found that the speech related to abortion and same-sex marriage was religious in nature. However, for the purposes of qualified immunity, the Court is unaware of any Fifth Circuit or Supreme Court case law that would have put Defendants on notice that speech related to abortion and same-sex marriage was religious speech for First Amendment purposes in 2013,[29] or that the speech was otherwise a matter of public concern.  Accordingly, it was not clearly established at the time of

---

[28] Defendants cannot secure qualified immunity by arguing that the religious speech was actually relied on to assess community involvement, and was therefore part of the Elrod-Branti exception.  For summary judgment purposes, the Court must view the evidence in the light most favorable to Lloyd, which requires the Court to assume that Defendants relied on the religious speech to make a hiring decision based on religion.

[29] The Supreme Court's 2014 decision in Hobby Lobby made it clear that a position against abortion could part of a person's closely held religious belief protected under the First Amendment; however that case was unavailable at the time of the events of this case.  134 S. Ct. at 2777.  Similarly, to the extent that the Supreme Court's 2015 decision in Obergefell v. Hodges has any bearing on the question, it was unavailable to Defendants in 2013.  2015 WL 2473451.

appointment that the speech regarding same-sex marriage and abortion was protected under the First Amendment against retaliation.

(C)    Speech About Political Affiliation

It was clearly established that any decision relying on Lloyd's political affiliation would violate clearly established First Amendment jurisprudence, unless that decision was somehow outside the scope of protection. See Jordan v. Ector Cnty., 516 F.3d 290, 295 (5th Cir. 2008).   Defendants argue that the speech was outside the scope of protection because "political allegiance may be demanded" from a "class of public employees" "whose First Amendment interests are outweighed by a governmental interest in the employees' political loyalty," Gunaca, 65 F.3d at 474, and it was reasonable to believe that the interim county constable fit into this protection.  Although the Fifth Circuit has addressed various positions, including county road managers, deputy county sheriffs, assistant district attorneys, school superintendents, secretaries to police chiefs, and deputy clerks, Gentry, 337 F.3d at 487, Matherne v. Wilson, 851 F.2d 752 (5th Cir. 1988), the Fifth Circuit has never addressed the position of county constable in terms of the Elrod-Branti exception.  Indeed, the Fifth Circuit has emphasized:

> [Q]ualified immunity is appropriate in a case where 'neither the Fifth Circuit nor the Supreme Court had addressed the issue of political patronage in the hiring or firing of investigators in district attorneys' offices, and neither had addressed an issue sufficiently analogous that a reasonable official would understand from its resolution that it is a First Amendment violation to dismiss or not hire an investigator on

the grounds that the investigator supported the campaign of the official's opponent.'"

Id. at 487.

The fact pattern here is entirely unique; the parties have not cited and the Court is unaware of any case involving a position that is traditionally elected, but that was filled as an interim position through a traditional hiring process. Given the dearth of case law, it was not unreasonable for the Commissioners to believe that political considerations were valid bases upon which to make their hiring decisions. Accordingly, it was not clearly established that the speech regarding political affiliation was protected.

In light of the foregoing, to the extent that Defendants relied on Lloyd's church membership in making their decision not to appoint him to the position of interim county constable, they retaliated against Lloyd in violation of the First Amendment and, therefore, a question of fact exists regarding the First Amendment retaliation claims against the individual defendants. However, any First Amendment retaliation claim based on Lloyd's views on gay marriage, abortion, or political affiliation is barred by qualified immunity based upon the law as it existed in 2013.

b.    First Amendment Free Exercise and Establishment
Clause Claim

Lloyd argues that, in addition to retaliating against him in violation of

the First Amendment, he suffered other First Amendment injuries, including

violations of his right to free expression and freedom of association, as well as

religious claims of free exercise and establishment.  (Dkt. # 48 at 49–50.)  He

argues that these violations are not based on Defendants' refusal to appoint Lloyd,

but instead were based on forcing Lloyd to disclose his beliefs against his will.  (Id.

at 50–51.)

Based on the briefing presented, the Court is unable to rule on these

First Amendment claims.  "The loss of First Amendment freedoms, even for

minimal periods of time, unquestionably constitutes irreparable injury."  Elrod, 427

U.S. at 373.  Notwithstanding, free expression, free association, Free Exercise

clause, and Establishment clause claims rely on a diverse array of doctrines which

Lloyd only address in a cursory manner.  See, e.g., Croft v. Perry, 624 F.3d 157,

165–70 (5th Cir. 2010) (discussing the four applicable tests for challenges under

the Establishment clause); Cornerstone Christian Schs. v. Univ. Interscholastic

League, 563 F.3d 127, 135 (5th Cir. 2009) (discussing the test under the Free

Exercise clause); Wallace, 80 F.3d at 1051 (describing the free association right as

coming under one of two lines of cases, the second of which protects "the right to

associate for the purpose of engaging in expressive activities protected by the First Amendment").

   In their Objections to the Report and Recommendation, Defendants contend that they raised a qualified immunity argument with respect to all of their federal constitutional claims.  However, the Court finds that Defendants only made a qualified immunity argument with respect to the First Amendment retaliation claims.  Except for argument on a duty to intervene theory and case citations to general qualified immunity standards, all of the cases to which Defendants cite involve First Amendment claims based on wrongful discharge, failure to hire, or other employment retaliation for First Amendment activity.  (See Defs. MSJ at 32–38.)  While such argument is certainly sufficient to "invoke qualified immunity" and shift the burden to Lloyd to show that the defense is unavailable for the First Amendment retaliation claims, see Kovacic v. Villarreal, 628 F.3d 209, 211 (5th Cir. 2010), it is insufficient to shift the burden to Lloyd on the remainder of the claims.

   Given the limited argument made on these claims, the Court is unable to rule on the remaining First Amendment claims, and **DENIES** summary judgment to the individual defendants on these First Amendment claims at this time **WITHOUT PREJUDICE**.  Should Defendants wish to resolve the issue

before trial, they should seek leave of Court to file a second motion for summary judgment on the remaining First Amendment issues.

c.      Federal Constitutional Privacy Claim

Defendants argue that Lloyd's constitutional privacy claim must be dismissed because Lloyd was not a public employee and there was no showing of causation.  (Defs. MSJ at 27–30.)

The Fourteenth Amendment protects the "individual interest in avoiding disclosure of personal matters" under the "disclosure strand" or "'confidentiality branch' of substantive due process privacy rights."  Zaffuto v. City of Hammond, 308 F.3d 485, 489 (5th Cir. 2002) (quoting Whalen v. Roe, 429 U.S. 589, 599 (1977)); Ramie v. City of Hedwig Village, 765 F.2d 490, 492 (5th Cir. 1985).  "The disclosure strand of the privacy interest . . . includes the right to be free from . . . the government inquiring into matters in which it does not have a legitimate and proper concern."  Ramie, 765 F.2d at 492.

The Court has already addressed Defendants' causation argument in the context of both Title VII/TCHRA and the First Amendment retaliation claim. The question of fact that precluded summary judgment in those circumstances is similarly raised here.[30]  Nor does the Court credit Defendants' argument with

---

[30] Causation is relevant to the privacy claim because it is brought through § 1983, which requires that "the defendant's conduct was the proximate cause of her

84

respect to Lloyd's employment status.  The Court is unaware of—and Defendants do not cite to any law—suggesting that a plaintiff must be a public employee to receive Fourteenth Amendment privacy protections.  So long as the government has made the prohibited inquiry, the Court fails to understand why the government's employment relationship with the plaintiff has any bearing.

Nevertheless, the Court finds that the evidence here is insufficient to support a Fourteenth Amendment privacy claim.  "There is no Fifth Circuit authority on what types of disclosures are personal enough to trigger the protection of the confidentiality branch, and . . . 'the contours of the confidentiality branch are murky.'"  Zaffuto, 308 F.3d at 490 (quoting Scheetz v. The Morning Call, Inc., 946 F.2d 202, 206 (3d Cir. 1991)).  The right is generally used to protect only "intimate facts" that are sufficient to raise the claim to a "constitutional dimension."  Id. (noting that a failure to limit claims to those categories "would tend to trivialize the Fourteenth Amendment by making it a magnet for all claims involving personal information, state officers, and unfortunate indignities").

Evaluation of a Fourteenth Amendment privacy claim is a two-step inquiry: first, the court evaluates whether any constitutional privacy interests were implicated by the disclosure, and, if there were, the court then balances the invasion of privacy alleged by the plaintiff against any legitimate interests proven

federally protected right."  4 Martin A. Schwartz, Section 1983 Litigation: Claims and Defenses § 6.03 (2015).

by the state.  See Cinel v. Connick, 15 F.3d 1338, 1343 (5th Cir. 1994) (failing to reach the balancing test because the allegations did not implicate constitutional privacy interests); see also Zaffuto, 308 F.3d at 490–91 (finding disclosures about plaintiff's dislike of his bosses to be a de minimis disclosure not rising to constitutional significance); Ramie, 765 F.2d at 492–93 (balancing need for disclosure of gender and religious beliefs with government interest in questioning criminal suspects); Fadjo v. Coon, 633 F.2d 1172, 1176 (5th Cir. 1981) (setting out the balancing test).

In Ramie v. City of Hedwig Village, the court addressed the constitutionality of questioning in the criminal context.  765 F.2d at 491.  There, police were investigating a citizen complaint that a man dressed as a woman represented himself as a city police officer and assaulted her son.  Id.  The police brought in the plaintiff for voluntarily questioning, during which they asked her about her gender, her gender identity, and whether she believed in Jesus Christ.  Id. at 492.  Although the court noted that "[g]ender and religious beliefs are generally not such intimate matters and are subject to public exposure," the court proceeded to balance her "slight invasion of privacy" against the City's legitimate interest in questioning criminal suspects.  Id. at 492–93.  The court ultimately concluded that the government's interest outweighed any invasion of privacy.  Id. at 493.

Lloyd contends that forced disclosure of his religious beliefs, including his place of worship, position on abortion, and position on gay marriage are constitutionally significant privacy interests that must be balanced against a legitimate governmental interest, which he argues is nonexistent here.

To the extent that Lloyd relies on the disclosure of his place of worship or political affiliation to support his claim, the Court finds those disclosures are de minimis and do not rise to a level of constitutional significance. In Ramie, the Court found that regular attendance of church reduced the constitutional significance of disclosure of religion, since the public would be privy to the plaintiff's church attendance.  765 F.2d at 492.  Additionally, the questions that Defendants asked of Lloyd regarding his political affiliation were part of the public record—the Commissioners in fact accessed that information on the internet during the course of the interview.  Given that this information was readily accessible to the public, the Court finds that it does not involve the "most intimate aspect of human affairs" so as to implicate a constitutional privacy interest.  Ramie, 765 F.2d at 492; see also Zafffuto, 308 F.3d at 490 (identifying only "extreme political and religious views" as having been addressed by other confidentiality cases).

To the extent that Lloyd relies on the disclosure of his positions on gay marriage and abortion, the Court finds no authority to support a constitutional

privacy interest in those disclosures.  "The Fifth Circuit has never held that a person has a constitutionally-protected privacy interest in her sexual orientation." Wyatt v. Fletcher, 718 F.3d 496, 506 (5th Cir. 2013).  Moreover, abortion-related jurisprudence has shifted the constitutional protections surrounding abortions from the right to privacy to substantive due process's protection of liberty interest.  See Jackson Women's Health Org. v. Currier, 760 F.3d 448, 467 n.21 (5th Cir. 2014). In light of such case law, the Court finds it difficult to assume that questions surrounding these issues as general social issues—rather than questions directed to a particular individual about his or her sexual orientation or whether she had received an abortion—rise to constitutional significance in the privacy context. Although these questions implicate religion—as discussed in the context of Title VII—the Court is not convinced that they are the type of religious beliefs that are "such intimate matters" that they meet the high threshold set out by the Fifth Circuit.  See Zaffuto, 308 F.3d at 490 (limiting the category of constitutionally significant privacy claims to avoid "trivializ[ing] the Fourteenth Amendment"). Because the Court finds no constitutionally protected privacy interest implicated, it need not balance an invasion with a governmental interest.  Accordingly, the Court **GRANTS** summary judgment to the individual defendants on the federal constitutional privacy claim.

d.     <u>Fourteenth Amendment Equal Protection Claim</u>

Defendants argue that Lloyd's Fourteenth Amendment equal protection claim[31] must be dismissed because Lloyd was not treated differently based on a protected characteristic, since Lloyd and Stofle were both Christian. (Defs. MSJ at 28.)  Additionally, Defendants raise their causation argument, which

---

[31] In his Response, Lloyd argues:

> Plaintiffs also have alleged claims for violation of their federal and state constitutional privacy, equal protection, and due process rights as well as prohibition of religious tests.  Defendants have not raised any arguments whatsoever as to Plaintiffs' due process or religious test claims in their motions for summary judgment, and therefore these claims must be determined at trial. . . . [I]t suffices to state the Due Process Clause of the Fourteenth Amendment was intended to prevent government from abusing its power, or employing it as an instrument of oppression.

(Dkt. # 48 at 52.)

> Presumably, Defendants did not raise any argument with respect to a due process claim under the Fourteenth Amendment because Lloyd did not allege a Fourteenth Amendment due process claim in his Amended Complaint.  The only relevant portion of the Amended Complaint alleges a violation of Lloyd's Equal Protection Rights under the Fourteenth Amendment:

> Under color of state law and through municipal policy, Defendants deprived Mr. Lloyd . . . of [his] right to equal protection under the Fourteenth Amendment to the United States Constitution by not hiring either Plaintiff as constable for the reasons stated above, without any compelling or even rational governmental reason for doing so.

(Am. Compl. at 7.)  Accordingly, the Court only addresses Equal Protection under the Fourteenth Amendment.

the Court has rejected for the reasons addressed above.[32]   (Id. at 29–30.)  Lloyd

counters that there is a legal distinction between religious denominations, and that

Lloyd belonged to and attended services at a Catholic church, while Stofle

belonged to and attended services at a Protestant church.  (Dkt. # 48 at 23–27.)

Lloyd also contends that the term "religion" includes all aspects of religious belief,

including positions on moral or ethical beliefs about what is right and wrong, and

that Lloyd and Stofle had different religious beliefs regarding same-sex marriage

and abortion.  (Id.)

          "To establish a Fourteenth Amendment equal-protection claim, [a

plaintiff] must 'allege and prove that he received treatment different from that

received by similarly situated individuals and that the unequal treatment stemmed

from a discriminatory intent.'"  McFaul v. Valenzuela, 684 F.3d 564, 577 (5th Cir.

2012) (quoting Taylor v. Johnson, 257 F.3d 470, 473 (5th Cir. 2001)).   Because

these proof requirements mirror those of Title VII, "[w]hen a § 1983 claim is used

as a parallel to a Title VII claim under a given set of facts, the elements required to

be established for each claim are deemed the same under both statutes."  Merwine

v. Bd. of Trustees for State Institutions of Higher Learning, 754 F.2d 631, 635 n.3

(5th Cir. 1985).  Since "the inquiry into intentional discrimination is essentially the

---

[32] Additionally, for the reasons described in the section discussing the general
claims under the First Amendment, Defendants have not raised a qualified
immunity argument with respect to this claim.

same for individual actions brought under section[] . . . 1983 and Title VII," a court need not undertake an equal protection analysis when a plaintiff's parallel Title VII claim has survived summary judgment.  See Lauderdale v. Tex. Dep't of Criminal Justice, Institutional Div., 512 F.3d 157, 166 (5th Cir. 2007); Jackson v. Lowndes Cnty. Sch. Dist., No. 1:08-CV-178-SA-JAD, 2010 WL 91245, at *7 (N.D. Miss. Jan. 6, 2010).  As discussed above, Lloyd's Title VII claim survives; accordingly, he has established a question of fact as to a constitutional violation under the Fourteenth Amendment.  The Court therefore **DENIES** summary judgment to the individual defendants on the Fourteenth Amendment Equal Protection claim.

e.   <u>Legislative Immunity</u>

In addition to raising a qualified immunity defense to the federal constitutional claims, Defendants raise a legislative immunity defense.  (Defs. MSJ at 39.)  Defendants contend that, because the Commissioners were acting as part of the County Commissioners Court in appointing Stofle, they were participating in legislative activity, which is absolutely immune from suit.  (Id.)

Absolute legislative immunity protects local legislators from liability when they act "in the sphere of legitimate legislative activity."  Bogan v. Scott-Harris, 523 U.S. 44, 49, 53 (1998).  "Not all actions taken by an official with legislative duties . . . are protected by absolute immunity—only those duties that are functionally legislative."  Hughes v. Tarrant Cnty., 948 F.2d 918, 920 (5th  Cir.

1991).  "Whether an act is legislative turns on the nature of the act, rather than on

the motive or intent of the official performing it."  <u>Bogan</u>, 523 U.S. at 54.  To

determine whether an activity is legislative, the Fifth Circuit uses two tests:

> The first test focuses on the nature of the facts used to reach the given
> decision.  If the underlying facts on which the decision is based are
> "legislative facts," such as "generalizations concerning a policy or
> state of affairs," then the decision is legislative.  If the facts used in
> the decisionmaking are more specific, such as those that relate to
> particular individuals or situations, then the decision is administrative.
> The second test focuses on the "particularity of the impact of the state
> action."  If the action involves establishment of a general policy, it is
> legislative; if the action singles out specific individuals and affects
> them differently from others, it is administrative.

<u>Hughes</u>, 948 at 921 (quoting <u>Cutting v. Muzzey</u>, 724 F.2d 259 (1st Cir. 1984))

(internal editing marks omitted).

Under either test, the actions at issue here were administrative, rather

than legislative.  The actions related to the hiring of a particular individual to fill a

county constable seat, rather than creating or establishing a general policy.

Accordingly, legislative immunity does not bar the federal constitutional claims in

this case.

### 2.    <u>Municipal Defendant</u>

A local government is liable under § 1983 for constitutional violations

arising out of policies or practices officially adopted and promulgated by the

government's officers.  <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 121 (1988);

<u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 694 (1978).  Because local

governments cannot incur § 1983 liability under a respondeat superior theory, they are only liable "for acts directly attributable . . . 'through some official action or imprimatur.'"  Peterson v. City of Fort Worth, 588 F.3d 838, 847–48 (5th Cir. 2009) (quoting Piotrowski v. City of Hous., 237 F.3d 567, 578 (5th Cir. 2001)).

   To establish municipal liability under § 1983, a plaintiff must prove that (1) a policymaker promulgated (2) an official policy or custom that (3) was the moving force behind the violation of the plaintiff's constitutional rights.  Monell, 436 U.S. at 694; accord Zarnow v. City of Witchita Falls, Tex., 614 F.3d 161, 166 (5th Cir. 2010).  The official policy prong can be met by a "single decision by municipal policymakers," Pembaur v. City of Cincinnnati, 475 U.S. 469, 480 (1986), so long as the plaintiff demonstrates that the conduct was deliberate and the moving force behind his injury, Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997).

   Whether an official is a policymaker for municipal liability purposes is a question of state law, which a court must resolve as a matter of law.  Jett v. Dall. Indep. Sch. Dist., 491 U.S. 701, 737 (1989).  In the case of hiring an interim county constable, Texas law is clear that the final policymaker for municipal liability purposes is the County Commissioners Court.  Tex. Loc. Gov't Code § 87.041(a)(10); cf. Brady v. Fort Bend Cnty., 145 F.3d 691, 700 (5th Cir. 1998) (holding that, under Texas law, the sheriff was the final policymaking authority

with respect to filling employment positions in the county sheriff's department, since the Texas legislature vested the sheriff with that discretion, which is not reviewable by any other official or government body).

At present, the circuits have developed three different approaches to determine how much of a Commissioner's Court must act with discriminatory motive to confer liability on the County.  The Eleventh Circuit subscribes to the majority test, which is urged by the County (dkt. # 55 at 6): a plaintiff must prove that the majority of the Commissioners acted with discriminatory purpose to constitute an unconstitutional act by the Commissioners Court.  See Matthews v. Columbia Cnty., 294 F.3d 1294, 1298 (11th Cir. 2002) (rejecting municipal liability for an allegedly discriminatory termination, which was implemented through a three-to-two vote by the County Board of Commissioners, where plaintiff could only demonstrate an unconstitutional motive on the part of one of the county commissioners that voted for the termination); see also LaVerdure v. Cnty. of Montgomery, 324 F.3d 123, 125 (3d Cir. 2003) (impliedly subscribing to the majority test by rejecting municipal liability because the comments at issue were made by only one member of the three-member Board of Commissioners); Scott-Harris v. City of Fall River, 134 F.3d 427, 437 (1st Cir. 1997) (reading the Second Circuit's United States v. City of Yonkers, 856 F.2d 444, 457–58 (2d Cir.

1988) opinion as impliedly adopting the majority test), rev'd on other grounds sub

nom. Bogan v. Scott-Harris, 523 U.S. 44 (1998).

Recognizing the challenges in proving discriminatory animus of a

legislative act, the First Circuit rejected a bright-line majority test and adopted the

significant bloc test, which requires a showing of "(a) bad motive on the part of at

least a significant bloc of legislators, and (b) circumstances suggesting the

probable complicity of others."  Scott-Harris, 134 F.3d at 438; see also Esperanza

Peace & Justice Ctr. v. City of San Antonio, 316 F. Supp. 2d 433, 453 (W.D. Tex.

2001) (adopting the significant bloc test because "it strikes the proper balance

between difficulty of proving a legislative body's motivation and the fact that a

municipal ordinance can only become law by majority vote of council").

Finally, the Sixth Circuit has adopted the "but for" test, which

imposes municipal liability for actions that a board "would not have taken 'but for'

members acting with improper motive."  Scarbrough v. Morgan Cnty. Bd. of

Educ., 470 F.2d 250, 262–63 (6th Cir. 2006).  The "but for" test focuses the court

on a tort-based inquiry as to whether the "board would have acted the same way,

absent improper motive."  Id. at 263.

If a jury finds some but not all County Commissioners acted

unconstitutionally at trial, the Court must decide this issue as an issue of first

impression for the Fifth Circuit.  However, because the Court has determined that,

as described above, there is a question of fact as to whether each individual commissioner is liable for First Amendment retaliation, additional First Amendment,[33] and Equal Protection claims, there is also a question of fact as to whether the County—through the County Commissioners—is liable for those unconstitutional acts.  Accordingly, for the reasons stated above, the Court **DENIES** summary judgment on municipal liability for the First Amendment retaliation and Equal Protection claims, **DENIES WITHOUT PREJUDICE** summary judgment on municipal liability for the other First Amendment claims, and **GRANTS** summary judgment on municipal liability for the Fourteenth Amendment privacy claim.

D.   <u>State Constitutional Claims</u>

Next, Lloyd alleges that Defendants violated his state constitutional rights to Equality and Privacy, and right against Religious Tests.  (Am. Compl. at 7–8; Dkt. # 48 at 52–54.)  Defendants moved for summary judgment on the state law claims by invoking official and legislative immunity.  (Defs. MSJ at 32, 39.) The Magistrate Judge only addressed the state law claims to the extent they were addressed in Plaintiff's Motion for Summary Judgment.  (See R&R at 22–31.)

---

[33] The question of fact on the additional First Amendment claims remains because the issues were not sufficiently briefed for the Court to make a determination.  The County, like the individual defendants, may seek leave of court to argue for summary judgment on the remaining First Amendment claims by separate motion.

Defendants object on the basis that they have pled official immunity, and that they have moved for summary judgment on official immunity and causation grounds.  (Dkt. # 61 at 13–14, 19.)  Because Defendants object to the Magistrate Judge's findings regarding the constitutional claims, the Court reviews the findings de novo.  Because the Court has already rejected the causation argument in other contexts, the only remaining issue is official immunity.

Defendants Birkman, Covey, Long, and Morrison[34] argue that they are entitled to official immunity from Lloyd's state constitutional causes of action because the Commissioners were acting within the scope of their authority appointing an interim county constable, performing discretionary functions, and acting in good faith.  (Defs. MSJ at 32.)

Official immunity is an affirmative defense for which the defendant bears the burden of proof, barring state law claims made against certain public officials when the suit arises from "performance of their (1) discretionary duties (2) in good faith (3) within the scope of their authority."  Ballantyne v. Champion Builders, Inc., 144 S.W.3d 417, 422 (Tex. 2004) (citing City of Lancaster v. Chambers, 883 S.W.2d 650, 653 (Tex. 1994)); Murillo v. Garza, 904 S.W.2d 688, 690 (Tex. App. 1995).  County Commissioners are the type of public officials to

---

[34] Defendant Gattis has not raised the official immunity defense in his Motion for Summary Judgment, nor has he incorporated the Remaining Defendants' Motion into his own.  Accordingly, he has not raised official immunity as a defense.

whom Texas courts have granted official immunity.  Id. at 423; Medina Cnty.

Comm'rs Ct. v. Integrity Grp., Inc., 944 S.W.2d 6, 10 (Tex. App. 1996).

To be entitled to summary judgment, the public official asserting

claims of official immunity bears the burden of "conclusively establish[ing]" each

of the official immunity elements.  Telthorster v. Tennell, 92 S.W.3d 457, 461

(Tex. 2002).  Accordingly, the Court considers each of the elements of official

immunity as a matter of law.[35]

### a.    Scope of Authority

"[P]ublic officials act within the scope of their authority if they are

discharging the duties generally assigned to them."  Ballantyne, 144 S.W.3d at

424.  "Even if a specific action is wrong or negligent, the employee still acts as

within the scope of this authority."  Medina Cnty., 944 S.W.2d at 9.

Here, the County Commissioners were interviewing candidates to fill

the interim county constable position, a duty which was legislatively assigned to

the County Commissioner's Court by the state.  See Tex. Loc. Gov't Code

§ 87.041 ("The commissioners court of a county may fill a vacancy in the office of

---

[35] As the Southern District of Texas has explained, "The test for good faith is
substantially the same as the test for qualified immunity.  The main difference,
however, is that official immunity does not incorporate the requirement that the
right alleged to have been violated be clearly established.  Rather, Texas'
good-faith test focuses solely on the objective legal reasonableness of the officer's
conduct."  Martinez v. Nueces Cnty., No. 2:13-CV-178, 2015 WL 65200, at *4
(S.D. Tex. Jan. 5, 2015) (internal citations omitted).

. . . constable. . . . The commissioners court shall fill a vacancy by a majority vote of the members of the court who are present and voting.").  Summary judgment evidence is undisputed that, following the interviews, the Commissioners voted on the appointment of Stofle to the position.  The Court finds that the Commissioners therefore acted within the scope of their authority in conducting interviews to hire the interim county constable.  See Medina Cnty., 944 S.W.2d at 10 (finding that the Commissioners acted within scope of authority when deciding whether to approve a final subdivision plan, when that decision occurred as part of an official action of a court meeting); see also Ballantyne, 144 S.W.3 at 424–25 (analyzing duties statutorily assigned to determine whether the action was in the scope of the defendants' authority).

> b.    Discretionary Function

To qualify for official immunity, the public official must have been performing a discretionary act, rather than a ministerial function.  See Ballantyne, 144 S.W.3d at 425.  As the Texas Supreme Court has explained:

> Ministerial acts are those for which the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment.  If the public official must obey an order, without having any choice in complying, the act is ministerial.  If an action involves personal deliberation, decision, and judgment, however, it is discretionary.

Id.  Because hiring involves personal deliberation, decision, and judgment, it is a

discretionary function under Texas law.  See Dovalina v. Nuno, 48 S.W.3d 279,

282 (Tex. App. 2001).

c.    Good Faith

"To determine whether a public official acted in good faith, we . . .

ask whether a reasonably prudent official, under the same or similar circumstances,

could have believed that his conduct was justified based on the information he

possessed when the conduct occurred."  Ballantyne, 144 S.W.3d at 426.  The test is

an objective test, which asks what a reasonable person "could have believed,"

rather than "what a reasonable person would have done."  Id.  Subjective bad faith

is irrelevant to the analysis.  Id. at 428.

In support of the good faith element, Defendants state,

"Commissioners acted in good faith because 'a reasonably prudent official, under

the same or similar circumstances, could have believed that his conduct was

justified based on the information he possessed when the conduct occurred.'"

(Defs. MSJ at 38.)  Defendants make no further argument about why it would have

been reasonable to think that asking and relying on the answers to the questions at

issue would have been justified in light of the Texas Constitution's Equality

Rights, Religious Tests, or Privacy clauses.  Because in the official immunity

context—unlike in the qualified immunity context—the burden rests with

Defendants to show they are entitled to official immunity by pointing to specific evidence on the record, see Chambers, 883 S.W.2d at 656–57, Defendants have not met their burden.  Accordingly, the Court **DENIES** summary judgment to Defendants on the state law claims based on official immunity.

E.     Injunctive Relief

Finally, Defendants moved for summary judgment on the claims for injunctive relief on the basis that it would be unprecedented to reopen the constable position and re-interview the candidates without asking the protected questions because the term for the interim constable ended and Stofle was reelected in the subsequent election.  (Defs. MSJ at 16.)  In its Reply, the County also asserted that, since Lloyd cannot succeed on any of his claims, he is not entitled to injunctive relief.  (Dkt # 55 at 7.)  Lloyd responded that denial of injunctive relief is not appropriate at the summary judgment stage where claims remain outstanding. (Dkt. # 48 at 65.)

The Court has denied summary judgment on some of Defendants' claims, leaving claims remaining for trial.  Accordingly, denial of injunctive relief at this stage is inappropriate.  Cf. Filgueira v. U.S. Bank Nat'l Ass'n, 734 F.3d 420, 423 (5th Cir. 2013) (denying injunctive relief where there were no valid underlying causes of action).  Moreover, even assuming arguendo that Defendants are correct that the Court does not have the power to issue an injunction reopening the

constable position, Lloyd has also requested injunctive relief enjoining Defendants from further engaging in these hiring practices.  (Am. Compl. at 11.)  Insofar as that argument was unaddressed by the Magistrate Judge, the Court **DENIES** summary judgment on that basis.

II.    Lloyd's Motion for Summary Judgment

        In his Motion for Partial Summary Judgment, Lloyd moves for summary judgment on the Texas constitutional privacy claim against the County. (Pl. MSJ at 1.)  Specifically, Lloyd argues that the County cannot meet its burden to show that an intrusion could not have been achieved by less intrusive, more reasonable means, and that the questions did not achieve any legitimate governmental interest.  (Id. at 8–10.)  The County responds that (1) there can be no invasion of privacy where information was voluntarily supplied; (2) the questions at issue do not amount to invasions of privacy; (3) regardless, there were constitutional violations because the situation was not a hiring scenario; (4) Lloyd's arguments are foreclosed by Branti; and (5) the request for injunctive relief is deficient.  (Dkt. # 47 at 5–14.)  In addition, the County argues that it cannot be held liable for the actions of two Commissioners and, regardless, is entitled to governmental immunity.  (Id.)

        In his Report and Recommendation, the Magistrate Judge recommended that the Court grant summary judgment on the Texas constitutional

privacy claim against the County.  (R&R at 31.)  Defendants object on several

grounds: (1) the Magistrate Judge improperly viewed the evidence in the light most

favorable to Lloyd, who was the movant; (2) Lloyd testified that if he was asked

the same questions while being vetted to run for the county constable position in an

election, it would not be an invasion of privacy; (3) the position of county

constable is a position exempt from liability under <u>Branti</u>; and (4) Lloyd's request

for an injunction is too vague, ambiguous and open-ended, and the Magistrate

Judge incorrectly concluded that the requirements for injunctive relief under Texas

law did not apply.  (Dkt. # 61 at 7–10.)  Because Defendants object to the

Magistrate Judge's findings on the privacy claim, the Court reviews the findings de

novo.

   Although the Texas Constitution does not contain an express right to

privacy,

> [The Texas Supreme Court's] opinion in [<u>Texas State Employees
> Union v. Texas Department of Mental Health and Mental Retardation</u>]
> recognized constitutionally protected zones of privacy emanating
> from several sections of article I of the Texas Constitution: section 6,
> concerning freedom of worship; section 8, concerning freedom of
> speech and press; section 9, concerning searches and seizures; section
> 10, concerning the rights of an accused in criminal prosecutions;
> section 19, concerning deprivation of life, liberty and property, and
> due course of law; and section 25, concerning soldiers in houses."

<u>City of Sherman v. Henry</u>, 928 S.W.2d 464, 472 (Tex. 1996) (citing <u>Tex. State</u>

<u>Emps. Union v. Tex. Dep't of Mental Health & Mental Retardation</u>, 746 S.W.2d

203, 205 (Tex. 1987)).  The "right to privacy should yield only when the

government can demonstrate than an intrusion is reasonably warranted for the

achievement of a compelling governmental objective that can be achieved by no

less intrusive, more reasonable means."  Tex. State Emps. Union, 746 S.W.2d at

205.

        Although the Texas Supreme Court has "never decided whether the

Texas Constitution creates privacy rights coextensive with those recognized under

the United States Constitution," Texas courts look to United States Supreme Court

privacy cases to define the scope of privacy rights under the Texas Constitution.

Bell v. Low Income Women of Tex., 95 S.W.3d 253, 265 (Tex. 2002) (applying

distinction developed under federal constitutional law to interpret right to privacy

under Texas Constitution).[36]  The Court has already addressed the state of federal

privacy law concerning the questions at issue and concluded that the questions did

not implicate a right to privacy that would trigger the balancing test with

------

[36] The Court notes that the Texas Supreme Court has decided the scope of the
privacy right by examining whether the ratifiers of the Texas Constitution would
have considered the right to privacy a fundamental right under the specific
constitutional provision invoked by the plaintiff.  See Henry, 928 S.W.2d 464
(examining whether disclosure of an extramarital affair was protected by the right
to privacy under § 19 of the Texas Constitution and holding that there was no
indication that at the passing of the Texas Constitution, the ratifiers "would have
considered the right to have a sexual affair with the wife of another an essential
component of life, liberty, or property").  However, without any argument from the
parties on that issue, the Court declines to address the claim on that basis.

governmental interest.  Construing the Texas constitutional right to privacy under

federal law, the Court finds no right to privacy implicated that would trigger the

balancing test under state law.  Because an invasion of privacy is a prerequisite to

any balancing with governmental interest, the Court finds no violation of privacy

rights protected by Texas Constitution.

Accordingly, the Court **DENIES** Plaintiff's Motion for Summary

Judgment (Dkt. # 41).

<u>CONCLUSION</u>

For the aforementioned reasons, the Court **GRANTS IN PART AND**

**DENIES IN PART** Gattis's Motion for Summary Judgment and the Remaining

Defendants' Motion for Summary Judgment and **DENIES** Lloyd's Motion for

Summary Judgment.  Accordingly, the Court **VACATES** the Magistrate Judge's

Report and Recommendation insofar as it denied defendants summary judgment on

the federal constitutional claims, granted Lloyd summary judgment on his state

constitutional privacy claims, and failed to address evidentiary objections, but

**ADOPTS** the Magistrate Judge's Report and Recommendation on the other issues,

albeit in many cases on different grounds.  <u>See, e.g.</u>, <u>Bluebonnet Hotel Ventures,</u>

<u>L.L.C. v. Wells Fargo Bank, N.A.</u>, 754 F.3d 272, 276 (5th Cir. 2014) (quoting

<u>Holtzclaw v. DSC Commcn's Corp.</u>, 255 F.3d 254, 258 (5th Cir. 2001)) ("An

appellate court may affirm summary judgment 'on any ground supported by the

record, even if it is different from that relied on by the district court.'").

The following claims remain for trial: Title VII and TCHRA claims against the County; First Amendment retaliation, First Amendment freedom of expression and freedom of association claims, and Fourteenth Amendment Equal Protection claims against the County and the individual defendants; and Texas Constitution claims against the County and the individual defendants.

**IT IS SO ORDERED.**

**DATED:** Austin, Texas, September 2, 2015.

_____
David Alan Ezra
Senior United States Distict Judge