THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ROBERT LLOYD, | § | NO. 1:13-CV-505–DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| LISA BIRKMAN, CYNTHIA LONG, | § | |
| VALERIE COVEY, individually and in | § | |
| their official capacities as County | § | |
| Commissioners of Williamson County, | § | |
| Texas, and WILLIAMSON COUNTY, | § | |
| TEXAS, | § | |
| | § | |
| Defendants. | § | |
| _____ | § | |

ORDER GRANTING DEFENDANTS'
SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT

Before the Court is a Supplemental Motion for Summary Judgment filed on December 16, 2015, with leave of Court (Dkt. # 89) by Defendants Lisa Birkman, Valerie Covey, Cynthia Long, and Williamson County. (Dkt. # 90.) Plaintiff Robert Lloyd filed a response on January 26, 2016. (Dkt. # 96.) On March 30, 2016, the Court heard oral argument on the Motion. Alan D. Albright, Esq., and Jay Aldis, Esq., appeared on behalf of Defendants; Wayne K. Yang, Esq., appeared on behalf of Plaintiff. After careful consideration of the memoranda in support of and in opposition to the motion, and in light of the

1

parties' arguments at the hearing, the Court, for the reasons that follow, **GRANTS**

Defendants' Supplemental Motion for Summary Judgment.  (Dkt. # 90.)

BACKGROUND

I.    <u>Factual Background</u>

On February 14, 2013, the sitting Constable for Williamson County's

Precinct 3, Bobby Gutierrez, submitted his resignation to the Williamson County

Commissioners' Court.  (Dkt. # 40, Ex. A at 3.)  Because the next election was

over a year away, the Commissioners invoked their power under Texas Local

Government Code § 87.041 to appoint a new constable to serve until the next

general election.  (Dkt. # 41, Ex. 1); <u>see</u> Tex. Gov't Code Ann. § 87.041.

On March 6, 2013, the Commissioner's Court, whose five members

were County Judge Gattis, Precinct One Commissioner Birkman, Precinct Two

Commissioner Long, Precinct Three Commissioner Covey, and Precinct Four

Commissioner Morrison, issued a call for applications to fill the vacancy.  (Dkt.

# 41, Ex. 1.)  The Court approved Gattis and Covey to review the resumes and

select five final candidates for interviews.  (<u>Id.</u>)

On March 18, 2013, the Commissioner's Court conducted an

executive session to privately interview candidates, including Lloyd.  (Dkt. # 41,

Ex. 16; Dkt. # 40, Ex. A at 40.)  During the interviews, the candidates received

questions about their positions on abortion and same-sex marriage, their political

2

affiliations, the churches that they attended, and their political ideology. ("Lloyd

Dep.," Dkt. # 41, Ex. 2, Ex. B at 164:15–167:5, 170:6–17.)

Specifically, Lloyd attests that Birkman's first question to him was

about his views on abortion, and Lloyd replied that, based on his Catholic faith, he

was pro-life. (Lloyd Dep. at 164:11–165:15.) He then clarified that his view was

somewhat qualified in circumstances of rape, incest, or the health of the mother.

(Id. at 205:1–206:20.) Lloyd states that Long and Covey frowned and exchanged

disapproving glances upon hearing Lloyd's answer. (Id.)

Birkman next asked about his views on same-sex marriage; Lloyd

responded that he was a heterosexual man who had been married to his wife for

over nineteen years; based on his faith, he believed that marriage was between a

man and a woman; but, nonetheless, the laws were shifting and the Supreme Court

could change at any time. (Lloyd Dep. at 165:20–167:20.) Birkman responded

that if he was appointed to the position, he would need to come up with a better

answer. (Id.)

Lloyd attests that Covey then took over questioning and asked him

which church he attended. (Lloyd Dep. at 170:1–173:5.) Lloyd responded that he

attended St. Helen's Catholic Church. (Id.) Covey asked Lloyd some additional

questions, and then Long began to question him. (Id.) Lloyd attests that Long

asked him if he was a Republican or a Democrat; Lloyd responded that although he

3

didn't understand why he was asked the question, he was a Republican.  (Id. at

174:8–177:17, 185:7–19.)  Long then asked him if he was a liberal or conservative,

to which he responded that if Republicans are conservative and Democrats are

liberal, he answered the question when he stated that he was a Republican.  (Id. at

181:1–25, 185:7–19.)  Before Lloyd could respond, he alleges that Birkman pulled

up his voting record on her phone and announced that he had voted Republican.

(Id. at 189:13–24.)

      During the interviews, Covey made notes with regard to Lloyd, "R –

vote," "prolife – + ≈ gay rights – not definitive."  (Dkt. # 41, Ex. 11, Ex. A.)

Following their interviews of the candidates, the Commissioners opened their

session to the public and formally voted to approve Kevin Stofle, another

applicant, as the interim county constable.  (Dkt. # 40, Ex. A at 491.)

## II.  Procedural Background

      On June 17, 2013, Lloyd brought suit.  (Dkt. # 1.)  On March 18,

2014, Lloyd and two additional plaintiffs[1] filed an Amended Complaint against

Birkman, Long, Covey, Morrison, Gattis and Williamson County[2] alleging

---

[1] These additional plaintiffs, Robert Goodrich and Fred Churchill, were dismissed
from the suit on February 17, 2015, pursuant to a joint motion by themselves and
Defendants.  (Dkt. # 73.)

[2] On March 29, 2016, Plaintiff and Defendants filed a joint stipulation of dismissal
dismissing all claims against Defendants Dan Gattis and Ron Morrison in their
individual capacities.  (Dkt. # 102.)

violations of the First and Fourteenth Amendments of the U. S. Constitution, various provisions of the Texas Constitution, Title VII of the Civil Rights Act of 1964, the Texas Commission on Human Rights Act ("TCHRA"), and Tex. Labor Code § 21.051.  (Dkt. # 11.)

On September 2, 2015, this Court issued an order addressing multiple motions for summary judgment.  (Dkt. # 76.)  Based on the record before it at the time, the order found that genuine issues of material fact existed as to (1) Plaintiff's Title VII and TCHRA claims against Williamson County (Dkt. # 76 at 55); (2) Plaintiff's First Amendment retaliation claim against all Defendants, insofar as he was asked questions about his Church membership (id. at 79); (3) Plaintiff's Fourteenth Amendment equal protection claim against all Defendants (id. at 91); and (4) Plaintiff's Texas Constitution claims against all Defendants (id. at 106).

The Court's summary judgment order also found that Plaintiff's claims regarding alleged First Amendment violations of his free expression, free association, Free Exercise and Establishment clause rights were insufficiently briefed by both parties, and could not be determined in the previous order.  (Dkt. # 76 at 82–84.)  The Defendants sought and received leave of Court to file the instant supplemental motion for summary judgment on these claims and seek their resolution prior to trial.  (Id. at 83–84, 96 n. 33; Dkts. ## 88, 89, 90.)

5

LEGAL STANDARD

"Summary judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Bridgmon v. Array Sys. Corp., 325 F.3d 572, 576 (5th Cir. 2003); Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The main purpose of summary judgment is to dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp., 477 U.S. at 323. If the moving party meets this burden, the non-moving party must come forward with specific facts that establish the existence of a genuine issue for trial. ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc., 699 F.3d 832, 839 (5th Cir. 2012). In deciding whether a fact issue exists, the Court "may not make credibility determinations or weigh the evidence." Tibler v. Dlabal, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003). "Where

6

the record taken as a whole could not lead a rational trier of fact to find for the
non-moving party, there is no 'genuine issue for trial.'" <u>Hillman v. Loga</u>, 697 F.3d
299, 302 (5th Cir. 2012) (quoting <u>Matsuhita Elec. Indus. Co., Ltd. v. Zenith Radio
Corp.</u>, 475 U.S. 574, 587 (1986)).

<u>ANALYSIS</u>

I.    <u>Preliminary Issues</u>

        Plaintiff raises numerous broad objections to the evidence Defendants
presented in support of their supplemental summary judgment motion.  (Dkt. # 96
at 2.)  Plaintiff makes no arguments in support of these objections, and the Court
will not try to make them for him.  The Federal Rules do not support the exclusion
of legally admissible information at the summary judgment stage, even if this
information is presented late.  See also Fed. R. Civ. P. 56(c)(3).  Accordingly, the
Court will consider those of Defendants' exhibits that do not rely on hearsay,
speculation, or other legally inadmissible evidence.

II.    <u>Individual Defendants' Claim to Qualified Immunity</u>

        Long, Birkman, and Covey raise the defense of qualified immunity as
to Plaintiff's First Amendment claims.[3]  Qualified immunity "protects government

---

[3] Plaintiff specifically alleges that Long, who asked him questions about his
political associations, violated his First Amendment rights to free association and
expression.  (Dkt. # 96 at 3.)  Plaintiff also alleges that Birkman, who asked him
questions about his beliefs and view on abortion and gay marriage, Covey, who
asked him questions about his Church, and Williamson County violated his First

7

officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "[Q]ualified immunity seeks to strike a balance between competing social objectives, providing breathing space for the 'vigorous exercise of official authority' while at the same time allowing a possibility of redress for victims of officials' abuses." Kinney v. Weaver, 367 F.3d 337, 346 (5th Cir. 2004). Accordingly, the defense protects "officials performing discretionary functions . . . from suit unless their conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known." Gunaca v. State of Tex., 65 F.3d 467, 473 (5th Cir. 1995). Even at the summary judgment stage, the defense of "qualified immunity 'gives ample room for mistaken judgment by protecting all but the plainly incompetent or those who knowingly violate the law.'" Poole v. City of Shreveport, 691 F.3d 624, 627 (5th Cir. 2012) (quoting Brumfield v. Hollins, 551 F.3d 322, 326 (5th Cir. 2008)).

Once a defendant pleads qualified immunity, the burden shifts to the plaintiff to negate the defense. Brumfield, 551 F.3d 322, 326 (5th Cir. 2008); Schultea v. Wood, 47 F.3d 1427, 1433 (5th Cir. 1995). Specifically, "a plaintiff

---

Amendment rights to free association and expression, and his rights under the free exercise and establishment clauses. (Dkt. # 96 at 3.)

seeking to defeat qualified immunity must show: '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" Morgan v. Swanson, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (quoting Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)); Pasco v. Knowblaunch, 566 F.3d 572, 579 (5th Cir. 2009).  The Court may address the two prongs of the qualified immunity test in whichever order it deems appropriate. See Pearson, 555 U.S. at 236.  Here, where Plaintiff alleges rather tenuous First Amendment claims, it is appropriate to address the second prong first.

In the Fifth Circuit, a plaintiff must meet a very high bar to demonstrate that law is "clearly established" in the First Amendment context. Swanson, 659 F.3d at 371.  Courts "do not deny immunity unless 'existing precedent . . . placed the statutory or constitutional question *beyond debate*.'"  Id. (quoting al-Kidd, 131 S. Ct. at 2083).  The prohibited conduct must be "defined with sufficient clarity to enable a reasonable official to assess the lawfulness of his conduct." McClendon v. City of Columbia, 305 F.3d 314, 331 (5th Cir. 2002) (en banc).  "For an official . . . to surrender qualified immunity, 'pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances.'" Harris v. City of

Balch Springs, 9 F. Supp. 3d 690, 696 (N.D. Tex. 2014) (quoting Pierce v. Smith, 117 F.3d 866, 882 (5th Cir. 1997)).

   A. Whether Plaintiff alleges a clearly established right

     1. Freedom of expression and free association claims

Plaintiff's response engages in an extended recitation of First Amendment jurisprudence in an effort to demonstrate that (1) Plaintiff was compelled to speak in violation of his clearly established First Amendment Right; (2) Defendants sought to exclude Plaintiff from the Constable position for failure to hold associations similar to their own; and (3) such actions should be evaluated using strict scrutiny.  (Dkt. # 96 at 11–15.)

None of the cases Plaintiff cites is relevant here.  For example, Plaintiff cites Sweezy v. State of New Hampshire for the proposition that he cannot be summoned and compelled to disclose his past expressions and associations.  354 U.S. 234, 250 (1957); (Dkt. # 96 at 11.)  Sweezy found that a state statute permitting the Attorney General to summon individuals for interrogation regarding allegedly subversive activities was unconstitutional under the First Amendment.  A reasonable person would not read this case to stand for the proposition that questions regarding a job applicant's political stance or religious affiliation, in an interview which the applicant voluntarily attended, violated their First Amendment right to freedom of speech or association.

Plaintiff also cites <u>Riley v. Nat'l Fed'n of the Blind of N.C., Inc.</u> to argue that requiring him to speak about topics upon which he would not ordinarily speak violates his First Amendment rights to freedom of speech and freedom of association.  487 U.S. 781, 795 (1988); (Dkt. # 96 at 12.)  <u>Riley</u> held that a state statute compelling professional fundraisers to disclose the percentage of contributions used for charitable purposes prior to requesting a donation unconstitutionally compelled speech; the holding is not clearly analogous to the instant situation, where Plaintiff was not compelled by law to answer the questions posed to him during his interview.  While Plaintiff states that the questions made him feel uncomfortable and that he felt compelled to answer based upon the circumstances, the situation he describes is so different from the situation in <u>Riley</u> that he cannot use the case to argue that the law is clearly established in this area. Likewise, none of the other cases Plaintiff cites with regard to First Amendment freedom of expression and freedom of association can be used to show that there was clearly established law at the time of the interview prohibiting the questions the Commissioner Court asked Lloyd.

Further, Plaintiff confuses the constitutional standards of review when he argues that strict scrutiny should be used to evaluate the Defendants' questions. (Dkt. # 96 at 13–15.)  Strict scrutiny is appropriate when reviewing a law or policy that restricts free speech.  Strict scrutiny is not appropriate here, where the court is

evaluating the specific acts of three individual government employees who were not acting pursuant to any policy.[4]  In the qualified immunity context, Plaintiff bore the burden of demonstrating the existence of clearly established First Amendment jurisprudence concerning lawful selection criteria for appointment to a vacant elected position.  Plaintiff failed to meet the burden to show that there was clearly established law in this regard.  In the interest of justice, the Court will engage in its own analysis of clearly established law to determine whether Defendants' questions violated any clearly established right.

      a.  <u>Freedom of Expression</u>

The "core value of the Free Speech Clause of the First Amendment is "[t]he public interest in having free and unhindered debate on matters of public importance." <u>Pickering v. Board of Ed. Of Twp. High Sch. Dist.</u>, 391 U.S. 563, 573 (1968).  Accordingly, a public employee's First Amendment right to free speech is violated when he is punished for "exercise of his right to speak on issues of public importance." <u>Id.</u> at 574.  However, a public employee's free speech rights may be constitutionally limited where he goes "about conducting his daily professional activities." <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 422 (2006). Accordingly, "[r]estricting speech that owes its existence to a public employee's

---

[4] In fact, Plaintiff himself states that the Defendants should have consulted the County policy or HR personnel regarding the form and content of the questions asked prior to the interview.  (Dkt. # 96 at 9.)

professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." Id. at 421–22.

Plaintiff does not allege that he was denied the interim constable position for engaging in any sort of public speech or debate that is clearly protected by the First Amendment right to free speech.  On the other hand, Defendants cannot argue that Plaintiff's interview answers were a part of his professional responsibilities and clearly not protected by the First Amendment right to free speech, because Plaintiff was not employed by Williamson County at the time he interviewed for the constable position.  This Court finds that while the law is clear as to speech in the public forum and in the context of speech directly connected to government employment, it is not clearly established in the circumstances at issue here: during an interview for an interim appointment for a normally-elected position.  Accordingly, after its review of both the cases cited by Plaintiff and its own research, the Court finds that Plaintiff has failed to establish that Defendants violated clearly-established law with regards to his free speech rights under the First Amendment.

      b.  Freedom of Association

It is clearly established that the "First Amendment 'forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power.'" Harris, 9 F. Supp. 3d at

13

705–06 (quoting <u>Rotan v. Republican Party of Ill.</u>, 497 U.S. 62, 64 (1990)).  This is true "because 'political belief and association constitute the core of those activities protected by the first Amendment.'" <u>Gunaca</u>, 65 F.3d at 474 (quoting <u>Elrod v. Burns</u>, 427 U.S. 347, 357 (1976) (internal citations omitted)).  The principal that the decision to fire a government employee cannot be based upon political affiliation can easily be extended to forbid making a hiring decision based upon a political affiliation.  <u>See, e.g.</u>, <u>Harris</u>, 9 F. Supp. 3d at 706.

However, there is a large exception to this rule: "political allegiance may be demanded [from] public employees whose First Amendment interests are outweighed by a governmental interest in the employees' political loyalty." <u>Gunaca</u>, 65 F.3d at 474.  In cases of permissible political patronage, "the government's interests outweigh the employees' interests where the employee is a policymaker or is confidential." <u>Wiggins v. Lowndes Cnty.</u>, 363 F.3d 387, 390 (5th Cir. 2004).  When determining whether a public employee's First Amendment interests are outweighed by a governmental interest in political loyalty, the Court should also consider "whether the employee acts as an adviser or formulates plans for the implementation of broad goals." <u>Elrod</u>, 427 U.S. at 368.

As this Court stated in its previous summary judgment order, the Fifth Circuit has granted qualified immunity to officials who engaged in political patronage dismissals in the past.  For example, the Fifth Circuit has held that

14

political allegiance can be demanded of an unelected road manager and county administrator who "occupy critical managerial roles in county government, and" whose "duties strongly influence[] the public's view of the elected board of supervisors." Gentry v. Lowndes Cty., 337 F.3d 481, 487 (5th Cir. 2003). Likewise, political loyalty may be considered when deciding not to retain a school superintendent who opposed the winning slate in a school board election, because the superintendent is responsible for implementing the decisions of the elected school board. Kinsey v. Salado Indep. School Dist., 950 F.2d 988, 996 (5th Cir. 1992).

We are presented with an unusual situation here, because Plaintiff was asked about his political affiliation in connection with his application for an interim appointment to what is normally an elected position. Had Plaintiff run for the position of Constable, his political loyalty would not only have been relevant, but would have been evaluated and determined by the electorate rather than a panel of County Commissioners. The County Commissioners certainly could have interpreted the existing law to believe that they could consider Plaintiff's political affiliation without violating his First Amendment Right to freedom of association. Whether or not this interpretation is correct, there is no clearly established law to refute it. For purposes of qualified immunity, Plaintiff has failed to demonstrate, and this Court has not been able to identify, the clear existence of a free association

right under the First Amendment against questioning Plaintiff about his political affiliations in connection with his interview.

    2.  <u>Free Exercise and Establishment Clause claims</u>

        Plaintiff relies on <u>Croft v. Perry</u>, a case challenging the Texas state legislature's amendment to the Texas state pledge of allegiance to add the words "under God," to argue that the law is clearly established with regard to his Free Exercise and Establishment Clause claims.  624 F.3d 157, 162 (5th Cir. 2010). Plaintiff argues that two tests applied in <u>Croft</u>, the "no sect preference test" from <u>Larson v. Valente</u>, and the "endorsement test" from <u>Lynch v. Donnelly</u>, apply to Defendants' conduct, rendering the law "clearly established" with regard to his Free Exercise and Establishment Clause claims.  (Dkt. # 96 at 9.)  The law surrounding Defendants' conduct is analyzed pursuant to each of the tests proposed by Plaintiff, below.

        a.  <u>Free Exercise</u>

        The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof …." While a large body of jurisprudence has developed regarding Establishment Clause violations by the actions of government officials which appear to endorse religion in one way or another, violations of the free exercise clause are typically limited to cases where a state legislature has passed a law burdening the free exercise of

religion, directly or indirectly, without having a compelling state interest for doing

so.  See, e.g. Thomas v. Review Bd. Of Ind. Empl. Sec. Div., 450 U.S. 707 (1981);

Wisconsin v. Yoder, 406 U.S. 205 (1972); Sherbert v. Verner, 374 U.S. 398

(1963).  The Defendants were not acting pursuant to any law or policy when they

interviewed Plaintiff; accordingly, Defendants' questions did not implicate any

area of clearly-established law under the Free Exercise clause of the First

Amendment.[5]

---

[5] Plaintiff briefly cites Rhode v. Denson in his papers and during the hearing to
argue that County Commissioners always act as policymakers, regardless of
whether they are acting in a legislative or administrative capacity.  (Dkt. # 96 at 2.)
776 F.2d 107, 109 (5th Cir. 1985).  This interpretation stretches the law.  Rhodes is
a case which found clearly unconstitutional actions by the county's elected
constable did not reflect county policy and did not render the county liable under
Monell.  Id.  The language in Rhodes upon which Plaintiff presumably relies
quotes another case, Familias Unidas v. Briscoe.  619 F.2d 391, 404 (5th Cir.
1980).  The plaintiffs in Familias Unidas challenged the constitutionality of a
Texas Education Code provision requiring public disclosure of the names of group
members in certain circumstances.  The Fifth Circuit found the challenged statute
was unconstitutional.  Id.  However, it determined that the elected Judge who
issued disclosure demands pursuant to the statute did not act in a way which
established municipal policy, and the County was not liable under Monell.  Id.

A further review of the case law reaffirms this Court's conclusion that Birkman,
Long, and Covey were not acting as policymakers during the interview.  While
County Commissioners certainly possess policymaking authority, this does not
render every single action by a County Commissioner an exercise of policymaking
authority, implicating Monell.  See, e.g. Bigford v. Taylor, 834 F.2d 1213, 1222
(5th Cir. 1988).  A crucial inquiry is whether the purpose of the Defendant
Commissioners' acts in interviewing candidates for the interim position "was to
adopt a rule that sought to control all such situations in the future."  Van Ooteghem
v. Grey, 774 F.2d 1332, 1338 (5th Cir. 1985).

    b.  Establishment Clause

There is "widespread judicial recognition of the law [regarding the Establishment Clause] as the 'thorniest of constitutional thickets,'" and qualified immunity is frequently granted in this area due to the ambiguity of the law. Swanson, 659 F.3d at 380 (quoting Peck v. Baldwinsville Cent. School Dist., 426 F.3d 617, 620 (2d Cir. 2005)).  Nonetheless, Plaintiff argues that two Establishment Clause tests the Fifth Circuit recently applied in Croft—the no sect preference test from Larson v. Valente and the "endorsement test" from Lynch v. Donnelly—clearly apply to Defendants' conduct, rendering Defendants' conduct unlawful.  (Dkt. # 96 at 9–11.)

    Plaintiffs focus on the following language from Larson: "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."  Larson v. Valente, 456 U.S. 228, 244 (1982). However, Larson, like Croft, was evaluating a *statute* which imposed burdens on certain religious organizations and not others, demonstrating a government

---

Plaintiff does not argue that the Defendants, by their questions, sought to adopt a rule by which all future interviews for interim appointments to normally-elected positions would be conducted.  Defendants themselves state that the intent of the questions was situation-specific: they sought to appoint an individual who would be suitable for reelection, thereby avoiding excessive turnover in the Constable position.  The evidence before the Court does not support a conclusion that the Defendants sought to exercise policymaking authority during the interview. Accordingly, the individual Defendants did not act as policymakers when they questioned Plaintiff during his interview.

preference for those non-burdened religions.  Id. at 254–55.  Larson makes clear

that the "First Amendment mandates governmental neutrality between [various]

religion[s] . . . The State may not adopt programs or practices . . . which aid or

oppose any religion." Id. at 246 (quoting Epperson v. Arkansas, 393 U.S. 97, 104

(1968) (internal quotations omitted)).  Here, Defendants did not operate pursuant to

any state law, program, or practice; Larson is not analogous to the situation here,

and does not constitute clearly established precedent, which would place "the

statutory or constitutional question *beyond debate.*"  Swanson, 659 F.3d at 371

(quoting al-Kidd, 131 S. Ct. at 2083).

Lynch, like Larson, emphasizes that "[t]he Establishment Clause

prohibits government from making adherence to a religion relevant in any way to a

person's standing in the political community."  Lynch v. Donnelly, 465 U.S. 668,

687 (1984).  However, even the most broad reading of the test in Lynch does not

clearly prohibit the conduct at issue here.  Lynch states that the Government

violates the Establishment clause through "excessive entanglement with religious

institutions," and "government endorsement or disapproval of religion."  Id. at 688.

Lynch concluded, after considering these principles, that a public city display of a

crèche as part of a larger Christmas exhibit did not constitute government

endorsement of religion.  Id. at 694.  Likewise, Croft found that inclusion of the

words "under God" in the Texas pledge of allegiance "acknowledges but does not endorse religious belief." <u>Croft</u>, 624 F.3d at 169.

Further review of the caselaw on this issue could span hundreds of pages, yet fail to find clearly established law, and the Court ends its inquiry here. It is possible that if this issue were litigated on its own, it could be found to violate the Establishment Clause of the First Amendment. However, considering the precedent of <u>Lynch</u> and <u>Croft</u>, and the dearth of cases addressing questions regarding religious preference in the context of a private interview for a government position, this Court must conclude that at the time the Defendants interviewed Plaintiff, the Establishment Clause did not clearly prohibit their conduct.

B. <u>Whether Plaintiff has alleged the violation of a clearly established right</u>

1. <u>Freedom of Expression and Free Association claims</u>

Here, Plaintiff's conduct does not fit squarely within an area of clearly established law. Because Plaintiff has failed to assert clearly established rights in the areas of freedom of expression and free association, his claims under these areas of law must fail. While it may have been unwise or awkward for Defendants to question Plaintiff regarding his views on gay marriage and abortion, political associations, and religion in an interview for appointment to a vacant elected position, these questions did not violate any clearly established freedom of

20

expression or freedom of association right under the First Amendment. Defendants Birkman, Covey, and Long are entitled to qualified immunity in this regard, and summary judgment is granted on this issue.[6]

    2.  <u>Free Exercise and Establishment Clause claims</u>

        As explained above, the Defendants were not acting pursuant to any law or policy when they interviewed Plaintiff; accordingly, Defendants' questions did not violate any clearly-established law under the Free Exercise clause of the First Amendment.  Further, there was no clearly established law under the Establishment Clause of the First Amendment at the time of Defendants' conduct which clearly prohibited asking questions regarding a job applicant's church membership.  Accordingly, while the questions may well have been unfair and inappropriate, they did not violate any clearly established First Amendment Principle under either the Free Exercise or Establishment Clause.  Defendants Birkman, Covey, and Long are entitled to qualified immunity in this regard, and summary judgment is granted on this issue.

  III.  <u>Williamson County's Claim to Municipal Liability</u>

        Yet again, the parties fail to do more than cursorily mention Williamson County's municipal liability.  However, where there is no violation of

---

[6] By its ruling today this Court is not endorsing the conduct of the Defendants in this case.  Many would find the questions at issue here inadvisable and inappropriate.  However, that is not the legal standard by which this Court must evaluate the matter before it.

a constitutional right, there can be no municipal liability for a violation.  <u>See</u>

<u>Monell v. Dep't of Social Servs. Of the City of N.Y.</u>, 436 U.S. 658, 691 (1978).

This Court finds Defendants Birkman, Covey, and Long are entitled to qualified

immunity for the alleged First Amendment violations.  Further, the Court finds that

the individual Defendants were not acting as policymakers when they questioned

Lloyd during the interview, because there is no evidence before the Court that the

Defendants intended to "adopt a rule" by their actions which would "control all

such situations in the future."  <u>Van Ooteghem</u>, 774 F.2d at 1338.  Therefore, the

Court cannot find that Williamson County is liable for those violations, and

summary judgment is granted in favor of Williamson County on these issues.

CONCLUSION

For the reasons stated above, Plaintiff failed to demonstrate the

presence of clearly established law with regards to his Free Expression, Free

Association, Free Exercise, and Establishment Clause claims under the First

Amendment; accordingly, Defendants Birkman, Covey, and Long are entitled to

qualified immunity on these issues, and summary judgment is **GRANTED.**  (Dkt.

# 90.)  Summary judgment is also **GRANTED** to Williamson County on these

claims.  (<u>Id.</u>)

**IT IS SO ORDERED.**

**DATED:** Austin, Texas, April 1, 2016.

_____

David Alan Ezra
Senior United States Distict Judge